782 So.2d 751 (2000)
James T. CAMPBELL, Appellant
v.
MISSISSIPPI EMPLOYMENT SECURITY COMMISSION and Heilig-Meyers, Appellees.
No. 1998-CC-01728-COA.
Court of Appeals of Mississippi.
July 18, 2000.
Rehearing Denied September 19, 2000.
*752 John M. Mooney Jr., Jackson, for appellant.
Mark D. Ray, Jackson, John Wesley Garrett Jr., Clinton, for appellees.
EN BANC.
KING, P.J., for the Court:
¶ 1. James T. Campbell, terminated from his employment on March 13, 1998, sought and was denied unemployment benefits. He now appeals to this Court that denial of benefits

FACTS
¶ 2. On April 5, 1998, Campbell filed a claim for unemployment compensation. In making this claim, Campbell indicated he had been fired on March 13, 1998.
¶ 3. When interviewed on this claim by Georgia Jones of the Employment Security Commission, Campbell indicated that there was a significant amount of racial discord in his work place. Campbell had attempted to discuss these matters with the manager to no avail. As a part of this interview, Campbell provided Jones with eleven pages of handwritten notations regarding work place problems.
¶ 4. On April 24, 1998, Jones submitted a recommendation to Cynthia Downer, an Employment Security Commission Program Specialist, that Campbell's claim should be allowed, since there was no evidence of deliberate misconduct.
*753 ¶ 5. On April 29, Downer responded to Jones' recommendation, "Please obtain employer's rebuttal to the information provided by the claimant. Please note, that this employer is represented by ADP/UCS, P.O. Box 6501, Diamond Bar, CA, 91765, and that ADP/UCS should be contacted if the local employer cannot or will not supply the necessary information."
¶ 6. On May 1, 1998, in response to Downer's memo, Jones wrote:
Please be advised that this employer was contacted on two previous occasions. Once on 4/24/98 at 1:40 PM, also on 4/29/98 at 1:30 PM Messages was left both time for the employer to return our call. He did not. Employer was called again on 5/1/98. The following information was obtained. Allen Dean, Human Resource Mgr. stated on 5/1/98. Claimant had been insubordinate. He did not always do what he was told. And his duties was constant, sometimes different personnel would asked him to do something else, but none of these thing was personal. The manager did listen to the claimant's complaint's and responded. Claimant did walk off the job without permission. Employer further stated he wanted copies of the tapes and wanted to be made aware of any decision made concerning this matter. He also requested further request be made to him at 1-800-877-8172 and mail be sent to Helig Meyers. Att: Allen Dean. Human Resource Dept. 12560 Wet Creek Parkway, Richmond, VA. 23238
¶ 7. Upon receipt of this response, Downer, on May 5, 1998 mailed to Campbell a "Notice of Non-monetary Decision," which stated:
You were discharged from your employment with Helig Meyers on March 13, 1998, for insubordination which constitutes a disrespect for authority. You, therefore, were discharged for misconduct connected with your work and are hereby, disqualified from receiving benefits from March 14, 1998, and until you have been reemployed and earned eight (8) times your weekly benefit amount or $1440.
¶ 8. On May 11, 1998, Campbell gave notice of his appeal to the Referee. On June 10, 1998, Brenda Kuriger, the appeals referee, conducted a hearing in this matter. Two witnesses appeared and testified, Tommy Sistrunk[1], the employer representative, and Campbell, the claimant.
¶ 9. Sistrunk testified that he had no involvement in the decision to fire Campbell, nor was he present when this decision was made. The decision to terminate was made by Peggy Bailey, the manager. Sistrunk said Bailey wrote insubordination and refusing to follow instructions as the reasons for firing Campbell. When asked what Bailey meant by insubordination, Sistrunk indicated he did not know.
¶ 10. Sistrunk testified that the failure to follow orders referred to orders given to Campbell by Jean Harris, who, while still employed at Heilig-Meyers, was not called to testify regarding Campbell's refusal to follow orders. In the absence of Harris, Sistrunk, who was not present at any of this, attempted to establish Campbell's refusal to follow orders through remote hearsay, stating, "They told me Terry argued with her (Harris) disagreed with her and left the building."
¶ 11. Upon further questioning by the Referee, Sistrunk stated that the reason for Campbell's discharge was his recording of a conference which involved Bailey, Sistrunk and Campbell on March 13, 1998.
*754 ¶ 12. Sistrunk testified that during that conference, Bailey informed Campbell that he would be further suspended. Campbell kept asking why and Bailey without explanation, indicated that was her decision.
¶ 13. Campbell testified that he had not refused to follow orders, but did acknowledge having recorded the conference with Sistrunk and Bailey. The unrebutted explanation offered by Campbell for taping this conference was ".... I had heard some pretty alarming things in that store and I said Lord I better do something to try to protect myself now. And that's what I did."
¶ 14. On June 11, 1998, the referee issued a written opinion upholding the denial of benefits. In that opinion the referee made the following findings of fact:
Claimant worked from December 12, 1997, until March 13, 1998, for Heilig Meyers, Forest, Mississippi. The claimant had been placed on a disciplinary suspension by his supervisor because of allegations of insubordination and refusing to follow instructions. The claimant was meeting with members of management regarding his suspensions and the allegations against him. The claimant made an audio tape of the meeting and the conversation. The fact that the claimant had taped the conversation was reported to management. The claimant's supervisor called the claimant and asked the claimant if he had made a tape of the meeting. The claimant declined to respond truthfully to the questions of management. He was terminated by his supervisor because he made the tape without the supervisor's knowledge and because he would not respond truthfully to the questions regarding the tape.
¶ 15. Campbell appealed this denial of benefits to the Board of Review. Without taking further testimony, the Board of Review, on July 16, 1998, adopted the findings of fact and opinion of the referee. This decision, like that of the referee, held that Campbell was fired solely because (1) he secretly taped the conference, and (2) "would not respond truthfully to the questions regarding the tape." It held that this was misconduct, which disqualified Campbell from the receipt of unemployment benefits.

DISCUSSION
¶ 16. Pursuant to Miss Code Ann. § 71-5-513A(1)(C) (Supp.1999) misconduct must be proven by the employer. It must be proven by "substantial, clear, and convincing evidence" Halbert v. City of Columbus, 722 So.2d 522 (¶ 10) (Miss. 1998).
¶ 17. The facts which relate to the recording are undisputed. Campbell testified that he made the recording for his protection. He was disturbed about the working conditions at Heilig-Meyers. He felt he had been receiving conflicting instructions. He felt that less than reasonable demands were being made upon him. He felt that the manager was unwilling to have a civil discussion with him. He heard a store employee use racial slurs at various times. One of the racial remarks troubling Campbell was hearing it said that Ms. Peggy (the person who discharged Campbell) had a problem with the number of African Americans there. These things are unrebutted in the record.
¶ 18. This Court is therefore faced, not with a question of fact but, with a question of law. That being whether as a matter of law a person who secretly records a conference for his protection, has engaged in misconduct which will preclude his receipt of unemployment compensation. The answer to this question is no.
*755 ¶ 19. Misconduct has been defined as, "conduct evincing such willful and wanton disregard of the employer's interest as is found in deliberate violation or disregard of standards of behavior which the employer has the right to expect from his employee." Wheeler v. Arriola, 408 So.2d 1381, 1383 (Miss.1982) The effort to protect oneself is not "conduct evincing such willful and wanton disregard of the employer's interest as is found in deliberate violation or disregard of standards of behavior...."
¶ 20. It is suggested that by not responding to Bailey's inquiry regarding having taped the meeting, Campbell was insubordinate. The definition of insubordination, as adopted by the Mississippi Supreme Court is, "A constant or continuing intentional refusal to obey a direct or implied order, reasonable in nature and given by and with proper authority constitutes insubordination." Shannon Engineering & Construction v. Emp. Sec. Comm'n, 549 So.2d 446, 449 (Miss.1989) Insubordination is included within the definition of misconduct, and must be proven by the employer. Miss Code Ann. § 71-5-513A(1)(C)(Supp.1999).
¶ 21. The employer has failed to produce evidence that Campbell refused to obey a reasonable order given by and with proper authority. Because misconduct must be proven, we cannot merely presume that Bailey had the authority and right to ask whether Campbell had recorded their meeting, and to expect an answer. Such cannot be presumed, particularly where Campbell testified that the recordation was made as a matter of protection.
¶ 22. The employer bears the burden of proving misconduct. That burden is not met by offering uncorroborated hearsay Mississippi Emp. Sec. Comm'n v. McLane-Southern, Inc., 583 So.2d 626, 628 (Miss.1991). Under these facts[2] this *756 Court does not find that employer met its burden of proof.
¶ 23. The dissent incorrectly characterizes this Court's opinion as approving the secret recordation of meetings. Nothing could be further from the truth. The question before this Court is whether such action constitutes misconduct as a matter of law. We hold that it does not.
¶ 24. There can be no question that Campbell's conduct reflected poor judgment or that it provided a basis for his dismissal. But what is equally clear is that it does not constitute misconduct as contemplated by this State's unemployment compensation statutes.
¶ 25. THE JUDGMENT OF THE SCOTT COUNTY CIRCUIT COURT IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES.
IRVING, LEE, PAYNE, and THOMAS, JJ., concur.
SOUTHWICK, P.J., dissents with separate written opinion joined by McMILLIN, C.J., BRIDGES and MOORE, JJ.
MYERS, J., NOT PARTICIPATING.
SOUTHWICK, P.J., dissenting.
¶ 26. The majority reverses, finding that there was no direct evidence to support that misconduct was the basis for the claimant's discharge. Instead it finds unrebutted evidence that what was found below to be misconduct was instead a justified effort by the claimant to protect himself by making a secret recording. I disagree. Secretly taping a meeting with a supervisor is something that could be found to be a wilful denial of an employer's legitimate interests. The MESC appeals referee found it to be so on these facts. I would affirm.
¶ 27. A preliminary procedural issue exists. The majority holds that uncorroborated hearsay was relied upon to find misconduct. The alleged hearsay problem arises from the fact the claimant's representative at the hearing did not have personal knowledge of some of these events. I find that non-hearsay evidence was also received and properly considered.
¶ 28. The only witness besides Campbell himself who testified at the hearing was a Heilig-Meyers supervisor named Sistrunk who was not directly involved in all of the key encounters that led to Campbell's termination. One relevant meeting with Campbell occurred on Thursday, March 12, 1998. The claimant on that day was told by a different supervisor that Campbell had on an earlier day improperly failed to complete his telephone calls. Campbell argued with the supervisor and left. The Heilig-Meyers witness at the hearing, Sistrunk, was present the next *757 day when Campbell and the supervisor had a discussion about the suspension. Later that day Sistrunk understood that Campbell was told over the telephone that he was terminated because he refused to confirm or deny another employee's report that he had secretly tape-recorded that day's meeting.
¶ 29. At the hearing, Campbell agreed with most of what Sistrunk had said, though he disagreed as to the date of one event. He stated that he was notified by telephone on Monday, March 9, that he was suspended until Friday. On Friday March 13 he had another meeting with his supervisor, and for disagreements that arose during the conversation he was suspended until March 30. Later in the day his supervisor called him and asked if he had recorded the meeting. He refused to answer, disparaged the supervisor's reliance on what another employee said about the recording, and was then told that he was terminated.
¶ 30. Though the Heilig-Meyers representative did not have first-hand knowledge of many of the key events, Campbell had that knowledge. While the burden is on the employer to prove benefit-forfeiting misconduct, the prima facie case at an administrative hearing can come from all the evidence that is presented, including the testimony of the claimant. In one case that presented a related problem, the employer sent no representative to the hearing but the appeals referee took testimony from the claimant anyway. Little v. Mississippi Employment Security Comm., 754 So.2d 1258 (Miss.Ct.App.1999). This Court held that the appeals referee could not take it upon herself to elicit the testimony necessary to support the employers' case. As the Court held, the employer "totally failed to appear for the hearing and expressed no interest in even participating in the hearing." Id. That rule is inapplicable here.
¶ 31. It is one thing for an employer not to make an appearance. At that stage, Little holds that the proper course is to rule for the claimant since the employer has indicated no desire to contest the issue. However, here the employer sent a representative. The claimant was present. As in any civil proceeding, an opposing party may be called as a witness. The witness is adverse, and substantial risk is assumed that the case cannot be made through the opposing party. Regardless, there is nothing akin to Fifth Amendment protections such that one party cannot be made to testify to the truth, the whole truth, and nothing but the truth even if the truth assists the other party. When both parties are participating in the proceedings, an appeals referee may take testimony from all who are present and who have relevant information and then may rely on that evidence in reaching a decision.
¶ 32. Having found far more than uncorroborated hearsay, I turn to whether disqualifying actions were shown. The evidence raises two different bases. One is the refusal to complete the phone calls that precipitated the encounters with Campbell's supervisor in the week of March 9. The other is the refusal to respond to his supervisor as to whether he had secretly recorded the meeting they had on March 13. The employer witness Sistrunk stated that it was his understanding that Campbell was fired for the combination of problems that the company had with him, with the refusal to state whether he had taperecorded the meeting being the final reason.
¶ 33. The original alleged deficiencies in Campbell's job performance only led to a suspension. The termination resulted from what occurred next. However, a series of events, each perhaps insubstantial in *758 itself, can together constitute insubordination sufficient to justify the denial of benefits. Shannon Engineering & Construction v. Mississippi Emp. Sec. Comm'n, 549 So.2d 446, 449 (Miss.1989) (insubordination is "a continuing refusal to obey a direct order" from the employer). The initial denial of the claim was based on insubordination, though the appeals referee and the board of review referred to misconduct.
¶ 34. Therefore, it is the alleged tape recording or the refusal to acknowledge whether that had occurred that completes the misconduct that might justify denial of benefits. The evidence does not support that a printed or otherwise published rule existed that meetings with supervisors should not be recorded. There has never been a requirement, though, that an employer's reasonable expectations regarding employees is limited to what is in writing. To use an obvious example, an employee could be terminated and be ineligible for unemployment benefits for physically assaulting another employee, regardless of whether a written rule so stated. That Campbell knew his employer would object to this taping could reasonably be inferred from the secrecy in which he did it and his refusal to answer the questions about it.
¶ 35. Secretly creating a recording of a private meeting shows a deceitfulness that an employer is entitled to prohibit in relations with employees. Regardless of whether a written rule to that effect existed, I find that tape recording a meeting between a supervisor and an employee regarding discipline is something that an employee should know is prohibited. His written claim before the MESC asserted that he had taped several different meetings, though apparently at the time he was fired only one of the tapes had become known to his employer. In my view such taping can be found to be a violation of a standard that could be expected of an employee. For Campbell to refuse to respond when questioned could be taken either as confirmation that the taping was made, or an equivalent act of misconduct and continuing insubordination.
¶ 36. The majority instead characterizes this as justified self-protection. It states that unrebutted evidence revealed that Campbell had been treated unfairly in the past, that racial slurs were used against him, and that in other respects the manager was not civil to him. At an administrative hearing, with limited discovery prior to the hearing as to what each side will present, I do not find a factual assertion by either party to fall into the category of unrebutted evidence, at least not if that is intended to invoke an obligation on the part of the fact-finder to accept it. The "rules of practice, procedure and evidence, formally observed in courts of law, are relaxed in proceedings before administrative agencies." Mississippi Gaming Comm'n v. Freeman, 747 So.2d 231, 241 (Miss.1999). Hearsay can be used as evidence supporting a result, "where it is corroborated or where there is other satisfactory indicia of reliability." McGowan v. Mississippi State Oil & Gas Bd., 604 So.2d 312, 320 (Miss.1992).
¶ 37. Thus the explanations of the Heilig-Meyers witness, largely corroborated by Campbell himself, were usable in reaching the administrative decision. Then the question becomes whether benefits had to be awarded because Campbell testified that he had been mistreated at the company and these tapes were his shield. It would appear that we are creating a rule to this effect: an employee is entitled to tape record meetings secretly if he believes (perhaps with a good faith requirement) that the employer may engage in unfair treatment during the meeting. I cannot find that the administrative hearing *759 must become a mini-trial on the validity of Campbell's complaints against the company. If Campbell had been mistreated in an actionable manner, there were means to gather evidence other than secret recordings.
¶ 38. Dissatisfactions by employees, justified in some cases and not in others, do not protect against a finding that misconduct has occurred. In other words, the alleged ends do not justify these means. What was important in the MESC process was whether Campbell deliberately disregarded "standards of behavior which the employer has the right to expect from the employees." Wheeler v. Arriola, 408 So.2d 1381, 1383 (Miss.1982). That is what was shown by unrebutted evidenceCampbell admitted making the recordings and just argues that they were necessary. If Campbell's alleged concerns about his employer are legitimate, they perhaps can be remedied. But those concerns do not insulate his conduct from the denial of unemployment benefits. It appears to me that the majority's view permits what the misconduct principle is supposed to prevent disruptive activities by employees in pursuit of some claimed personal interests. If secret taping of conversations with supervisors is to be approved, at least to the extent of concluding it is not misconduct whenever the employee argues that he had a reasonable complaint that he was being mistreated, then we are laying the foundation for suspicion and distrust in the workplace. To say that in some cases such suspicions are already present does not justify our exacerbating them by this rule. Such concerns need to be pursued by different means than Campbell undertook in this case.
¶ 39. Let me say, though, what I am not saying. There may not have been anything actionable about what Campbell did. Mississippi has a statute specifically prohibiting secret taping of conversations, whether the conversations are face-to-face or electronically transmitted. Miss.Code Ann. § 41-29-501(a), (g), (j), (n) & § 41-29-529 (Supp.1999). That reveals a strong official opinion that secret recording is insulting and is prohibited. But the statute itself only makes actionable what colloquially could be called "eavesdropping," that is, recording when none of the people involved in the conversation are aware of the recording. Miss.Code Ann. § 41-29-531(e) (the statute does not apply to a conversation intercepted by someone who "is a party" to it). Therefore to the extent a civil action could be brought by someone whose conversation was unknowingly recorded, that action cannot be brought under this statute when the recording is done by a participant.
¶ 40. Whether Campbell was reasonable or not in his now-stated complaints against his employer is not our question. Neither is whether he violated any law by secretly recording his conversations. What we are deciding is whether the employer has to pay unemployment compensation when he is discharged for those recordings. I think not. Otherwise the MESC procedures have to be exhaustive enough in discovery and presentation of evidence to explore meaningfully whether the threshold requirements are met to turn otherwise disqualifying misconduct into protected self-help investigatory techniques. I do not believe the MESC process can bear such an evidentiary obligation.
¶ 41. I would remove the protections that the majority gives to these tapes and look at whether what was presented by the employer and corroborated by Campbell constituted misconduct. That is to be judged under the traditional definition of misconduct which I have discussed already. See Wheeler, 408 So.2d at 1383. In addition to that, the Commission has *760 established guidance for appeals referees and others in resolving claims. That guidance appears in a manual that has not been promulgated through rule-making procedures, but is intended to be a summary of court precedents and other useful references for the agency. After quoting the Wheeler definition, the guidance also provides this:
An employee shall not be found guilty of misconduct for the violation of a rule unless: (1) the employee knew or should have known of the rule; (2) the rule was lawful and reasonably related to the job environment and job performance; and (3) the rule is fairly and consistently enforced.
MISS. EMP. SEC. COMM'N, BENEFIT PROCEDURAL HANDBOOK, § 2 F. (2) (Rev.1995). This standard was quoted in the order entered by the appeals referee in this case and found to have been met.
¶ 42. These three elements are a justified gloss on the supreme court's definition. I also find that they helpfully point us in the right direction in this case. The employer should have known that he could not record the meeting secretly. A better regard for his employer's interest could have led to a request to record, though that quite possibly would have been denied. The rule is reasonably related to the job environment. There was no evidence as to any other employees having secretly taped conversations, so disparate treatment under the rule is not an issue.
¶ 43. I find no error procedurally or substantively by the appeals referee. I would affirm.
McMILLIN, C.J., BRIDGES and MOORE, JJ., join this separate opinion.
NOTES
[1] The relevant portion of Sistrunk's testimony is contained in footnote 2.
[2] The relevant evidence on this matter by the employer is as follows:

Q. What reason did she give Mr. Campbell for discharging him?
A. What she put on her papers was insubordination and refusing to follow instructions.
Q. Do you know how he was insubordinate?
A. I don't know what she meant by it, I mean, I wouldn't ... no, I can't answer that.
Q. Do you know what instructions it was he refused to follow?
A. The instructions that I understand that he refused to follow was from his supervisor of the person in charge of him.
Q. Who was his supervisor?
A. At the time Ms. Jean Harris. I can't even think of names.
Q. And do you know what it was that he didn't do that he was asked to do by... it is Ms. Harris?
A. Yes.
Q. Do you know what it was that he refused to do?
* * * *
A. They told me that Terry argued with her, disagree with her and left the building.
Q. Were you privy to that conversation, were you present?
A. No, I was not present.
Q. Is Ms. Harris still with the company?
A. Yes.
Q. Why did she not come today?
A. Well, I don't know, we didn't think it was necessary. She can if you need to talk to her.
Q. So on that Thursday morning it's your understanding that he was involved in an argument with Ms. Harris and he left the premises, is that your understanding?
A. That's my understanding.
Q. Had he received permission to leave the premises?
A. I was told not.
Q. Was that the final incident that caused him to be discharged?
A. No, the next day on Friday the 13th, Ms. Peggy and I and Terry met in her office and she told Terry that he would be put on suspension for a number of days. And I cannot recall the number of the days that he was going to be put on suspension. Terry kept questioning her why he was being put on suspension and she said that was her decision, you know, from what had happened on Thursday, that she was putting him on suspension. And later that day we were told by one of our employees that Terry recorded our conversation without us knowing this. And Ms. Bailey called him and questioned him did this happen and he never would give her an answer, so she terminated him.
Q. So was he terminated because he recorded the conversation, was that the sole reason?
A. Well, I supposed that was the final straw, yes, ma'am.
Q. And you were not aware that the conversation was being recorded?
A. No, I did not. And I was not present when she told him he was terminated. I think she talked to him on the telephone about that.