949 So.2d 805 (2006)
Luke T. McCLINTON, Appellant.
v.
MISSISSIPPI DEPARTMENT OF EMPLOYMENT SECURITY, Appellee.
No. 2005-CC-01961-COA.
Court of Appeals of Mississippi.
October 17, 2006.
*807 David H. Linder, Meridian, attorney for appellant.
Leanne Franklin Brady, attorney for appellee.
Before KING, C.J., SOUTHWICK and IRVING, JJ.
SOUTHWICK, J., for the Court.
¶ 1. The Mississippi Department of Employment Security denied Luke McClinton unemployment benefits. McClinton argues that there was not substantial evidence of disqualifying misconduct. We disagree. The judgment denying benefits is affirmed.

FACTS
¶ 2. McClinton was employed as an x-ray technician at Rush Hospital in Meridian, Mississippi from September 1, 2001 to September 17, 2004. McClinton was first employed as a student technician for approximately two years, then as a registered technician during his last year at Rush. McClinton was terminated for insubordination, inappropriate and rude behavior with co-workers, use of profanity, and not performing his job duties. Shortly after his termination, McClinton filed for unemployment benefits. A claims examiner found that McClinton's termination was due to misconduct and benefits were denied. McClinton appealed and received a favorable decision from an appeals referee. The referee found that Rush did not provide substantial evidence to prove that McClinton was fired for misconduct. Rush appealed to the Board of Review. The Board disagreed that there was any shortage of usable evidence, made additional findings of fact, and denied benefits. The next appeal was heard by the Lauderdale County Circuit Court, which affirmed. The Supreme Court deflected McClinton's appeal to this Court.

DISCUSSION
¶ 3. A decision by the Board of Review of the Department of Employment Security is the final decision of the agency as to unemployment benefits. A decision by the Board will not be disturbed unless it is "(1) unsupported by substantial evidence, (2) arbitrary or capricious, (3) beyond the scope of power granted to the agency, or (4) in violation of the employee's constitutional rights." Johnson v. Miss. Emp. Sec. Comm'n, 761 So.2d 861, 863 (Miss.2000). The only issue raised here is that the decision was not supported by substantial evidence. We limit our discussion to that.
*808 ¶ 4. McClinton was denied benefits because he was found to have been discharged for insubordination, a form of misconduct. Actions that constitute "misconduct" are a proper basis for denying unemployment benefits. Miss.Code Ann. § 71-5-513(A)(1)(b) (Supp.2005); Wheeler v. Arriola, 408 So.2d 1381, 1383 (Miss. 1982). Once a former employee has filed for benefits, the evidentiary burden is on the former employer to show by "substantial, clear, and convincing evidence" that the claimant is disqualified from receiving benefits. Pannell v. Tombigbee River Valley Water Mgmt. Dist., 909 So.2d 1115, 1120 (Miss.2005). The first issue we will discuss is the kind of evidence that must exist before the total evidence may be considered to be substantial.
(1): Consideration of hearsay as substantial evidence
¶ 5. Decisions by an administrative agency receive deference. St. Dominic-Jackson Mem'l Hosp. v. Miss. State Dep't of Health, 910 So.2d 1077, 1081 (Miss. 2005). The facts will not be re-weighed nor will the discretion of the court be substituted for the discretion of an agency. Id.
¶ 6. As we have already summarized, an agency decision must be supported by substantial evidence. Administrative agency hearings are not limited to strict rules of evidence. Davis v. Pub. Emp. Ret. Sys., 750 So.2d 1225, 1231 (Miss.1999). However, "uncorroborated hearsay testimony is insufficient to rise to the required level of substantial evidence." Miss. Emp. Sec. Comm'n v. McLane-Southern, Inc., 583 So.2d 626, 628 (Miss. 1991).
¶ 7. The Mississippi Supreme Court has never cited its opinion in McLane-Southern. This Court has cited it only twice for the uncorroborated hearsay statement. The more recent use led to reversal because we found that the only evidence supporting the disqualifying conduct was such hearsay. Campbell v. Miss. Emp. Sec. Comm'n, 782 So.2d 751, 755 (Miss.Ct. App.2000). In an earlier decision, this Court examined somewhat closely the "uncorroborated hearsay" language; the Department refers us to that opinion as an accurate statement of the law. Miss. Band of Choctaw Indians v. Miss. Emp. Sec. Comm'n, No. 96-CC-01323-COA (Miss.Ct.App. Aug. 8, 1998). That opinion was not published, is therefore not precedent, and usually should not be cited. M.R.A.P. 35-B (b). However, since this litigation includes the governmental party involved in that earlier appeal, we may, and even should, reexamine the opinion as we analyze the issues before us today.[1]
*809 ¶ 8. We examine the relevant portion of our earlier opinion.
The [Mississippi Band of Choctaw Indians (MBCI)] contends that the referee's decision was arbitrary and capricious because it was based on a misreading of McLane-Southern, Inc. The referee relied on McLane for the proposition that live testimony always overrides "uncorroborated hearsay in the form of testimony and through statements," which the referee implicitly categorized MBCI's affidavit testimony to be. Whether that is a correct reading is determined by examining McLane.

McLane-Southern had sought to meet its burden of proof by using a nine-page document prepared by the employer "without a sponsoring witness and over the objection of the employee." McLane-Southern, 583 So.2d at 628. The document was described as nothing more than "uncorroborated hearsay" evidence. Id. The court relied upon a precedent in which the MESC had made the factual determinations necessary to deny benefits based on allegations in a letter from the employer to the MESC Board of Review. Williams v. Mississippi Employment Sec. Comm'n, 395 So.2d 964, 965-966 (Miss.1981). The Williams court held that uncorroborated hearsay was not "substantial evidence," and remanded for further proceedings. Id. at 966.
In the present case, the MBCI offered live testimony in addition to affidavits. The affidavit of H.L. "Billy" Smith was based on personal knowledge. Smith was the employee who gathered evidence on [Tim] Ben's absences. That affidavit referred to specific dates and times during which Smith observed Ben arriving late and leaving early. The affidavits were introduced through a sponsoring witness.
The McLane-Southern rule is nothing more than the earlier Williams pronouncement: hearsay allegations and unsworn statements cannot be "substantial evidence."
Miss. Band of Choctaw Indians, slip op. at 5-6.
¶ 9. We agree with the points made in what we have just quoted, though what "uncorroborated hearsay" should be interpreted as meaning we still must discuss. However, we disagree that the statement that appeared next in the opinion is technically accurate. "An affidavit may or may not be hearsay. It is not hearsay because of its form. It may be hearsay because of what it contains." Id., slip op. at 6. An affidavit is hearsay under the evidentiary rules for courts. See M.R.E. Art. VIII, "Introduction." Still, an affidavit may not be the kind of hearsay that McLane-Southern rejected as sole support for a decision, a point to be resolved. Some affidavits are reliable hearsay, but it was error to state that an affidavit is not traditional hearsay.
¶ 10. The hearsay label does not resolve whether an affidavit expressing first-hand knowledge, properly authenticated, is what the Supreme Court was excluding by its McLane-Southern pronouncement. When the court declared that "uncorroborated hearsay" could not by itself be substantial evidence to support an agency adjudication, it was quoting a decision from ten *810 years earlier in which that statement was apparently first made in Mississippi administrative jurisprudence. Williams, 395 So.2d at 965-66. Williams in turn relied on a case from Delaware and another from Massachusetts. Williams, 395 So.2d at 966, citing Geegan v. Unemployment Comp. Comm'n, 45 Del. (6 Terry) 513, 76 A.2d 116 (1950); Sinclair v. Dir. of Div. of Emp. Sec., 331 Mass. 101, 117 N.E.2d 164 (1954). The Delaware decision said that relaxed rules of evidence did not justify decisions that were "not based upon evidence having probative value." Geegan, 76 A.2d at 117. The Massachusetts court held that the evidence on which an agency decision was based could not be "exclusively hearsay"; there must at least be corroboration. Sinclair, 117 N.E.2d at 165.
¶ 11. Williams, unlike McLane-Southern, has been occasionally cited by the Supreme Court. In most opinions, the "uncorroborated hearsay" issue is not discussed. E.g., Booth v. Miss. Emp. Sec. Comm'n, 588 So.2d 422, 424 (Miss.1991) ("`evidence,' as used in § 71-5-531, has been interpreted to mean `substantial evidence'"); Ray v. Bivens, 562 So.2d 119, 121 (Miss.1990) (must be substantial evidence to support decision); Shannon Eng. & Constr., Inc. v. Miss. Emp. Sec. Comm'n, 549 So.2d 446, 449 (Miss.1989) (same). Only one time other than in McLane-Southern was Williams cited by the Supreme Court for the "uncorroborated hearsay" point. The Court noted that its decisions "have stated that the word `evidence' means `substantial evidence' which is not uncorroborated hearsay." Miss. Emp. Sec. Comm'n v. Flanagan, 585 So.2d 783, 785 (Miss.1991). However, "the direct testimony of two witnesses who testified to two separate acts of Flanagan striking a child behind the head with her hand" was substantial evidence. Id.
¶ 12. This Court has not often referred to the need for corroboration either. Once we found the reliance on disputed hearsay evidence to be error. We reversed using this explanation:
The Board of Review found that Julie Carlisle voluntarily left her employment with Gilbreath on May 17, 2002 to relocate to another locality. The record before the MESC does not support this finding. The only mention of any possible relocation by Carlisle is in the initial report of the employment interviewer who records that Gilbreath stated that Carlisle quit "because she was going to relocate to Alabama with her brother." Carlisle, however, denied this contention. When Gilbreath testified before the appeals referee, he made no reference to any relocation by Carlisle, and his only mention of Alabama was that Carlisle planned to spend a week's vacation with her brother in June. Whether Gilbreath altered his account of Carlisle's separation, or whether the employment interviewer misinterpreted his original account, we do not know. However, the Board of Review's reliance upon this discredited statement to support its finding that Carlisle voluntarily left her employment is arbitrary or capricious.
Gilbreath v. Miss. Emp. Sec. Comm'n, 910 So.2d 682, 687 (Miss.Ct.App.2005). "Uncorroborated hearsay" was referenced only when concluding that we should remand. Id. at 688 n. 4.
¶ 13. Another one of our decisions also analyzed Williams. In affirming despite the claimant's objection that a typed memorandum from her former employer had been used as evidence against her, we held that "[h]earsay evidence can be admitted in an administrative proceeding so long as uncorroborated hearsay is not considered sufficient to meet the substantial evidence *811 standard. Williams v. Miss. Emp. Sec. Comm'n, 395 So.2d 964, 966 (Miss.1981)." Howell v. Miss. Emp. Sec. Comm'n, 906 So.2d 766, 770-71 (Miss.Ct.App.2004). We found corroboration from the claimant's own testimony and also from another witness. Id. at 771.
¶ 14. In the final precedent that discussed the issue, the Workers' Compensation Commission refused to rely on a medical technician's report concerning what unnamed co-workers had said about the cause of the claimant's injury.
Considering the centrality of the issue of causation, the administrative judge may well have believed that witnesses with actual knowledge of what occurred should have been called or affidavits or other evidence obtained from them. Reference in a medical report to what unknown people with an unknown level of knowledge may have said did not have to be given appreciable weight by the administrative judge nor by the Commission in its review.
Brock v. Hankins Lumber Co., 786 So.2d 1064, 1069 (Miss.Ct.App.2000).
¶ 15. How we are to apply this rarely invoked "uncorroborated hearsay" limitation, rare despite the large number of administrative appeals to the two Mississippi appellate courts, can be informed by a 1979 decision involving the Workers' Compensation Commission. The Mississippi Supreme Court held that it was error for an administrative judge to admit unsworn reports from the claimant's doctors, as this evidence was incompetent. Georgia-Pacific Corp. v. McLaurin, 370 So.2d 1359, 1361 (Miss.1979). Justice Lemuel Augustus Smith, Jr. for the court wrote that the "bench and bar would be scandalized if this Court should approve the receiving in evidence of ex parte, unsworn statements of persons other than doctors, even in Workmen's Compensation cases." Id. at 1362. The court then stated that there was nothing about doctors that would justify a different rule. Id.
¶ 16. Despite the strong language of being "scandalized," the McLaurin court encouraged the Commission to adopt a procedural rule permitting medical records to be introduced if notice was given to all parties in advance of the hearing. Id. In 1993, the Workers' Compensation Commission adopted a rule that permitted receipt of medical reports into evidence provided there is a medical records affidavit. Miss. Workers' Comp. Comm'n Proc. Rule 9. Such records, though technically hearsay, can be the sole evidence on which the Commission relies to determine the medical condition of the claimant. See JOHN R. BRADLEY & LINDA A. THOMPSON, MISSISSIPPI WORKER'S COMPENSATION, § 6:33 (Thomson-West 2006).
¶ 17. We find these changes in Workers' Compensation Commission rules to be relevant. By overturning the effect of McLaurin, the Commission with Supreme Court approval was bringing its practices in line with the authority that the McLaurin administrative judge had relied upon to admit the medical reports. That authority was a United States Supreme Court decision that allowed hearsay medical reports to be substantial evidence in a Social Security disability claim. Richardson v. Perales, 402 U.S. 389, 407, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). The Perales court noted that the physicians could have been subpoenaed by the party who disagreed with the reports. Id.
¶ 18. The 1971 Perales decision was an abandonment of an "uncorroborated hearsay" rule that the United States Supreme Court itself had adopted in 1938. Consol. Edison v. Nat'l Labor Rel'ns Bd., 305 U.S. 197, 230, 59 S.Ct. 206, 83 L.Ed. 126 (1938). Chief Justice Charles Evans Hughes wrote that though hearsay was admissible at *812 agency hearings, agency orders cannot be justified "without a basis in evidence having a rational probative force. Mere uncorroborated hearsay or rumor does not constitute substantial evidence." Id. The Perales decision stated that Hughes's language "was not a blanket rejection by the Court of administrative reliance on hearsay irrespective of reliability and probative value. The opposite was the case." Perales, 402 U.S. at 407-8, 91 S.Ct. 1420. The perceived problem was not uncorroborated hearsay per se but using hearsay that was unreliable.
¶ 19. The Perales analysis has been explicitly used by the Mississippi Supreme Court as to decisions involving the Public Employee Retirement System. Pub. Emp. Ret. Sys. v. Stamps, 898 So.2d 664 (Miss.2005). The Supreme Court quoted Perales to the effect that a hearsay medical report could be substantial evidence in an administrative claim:
We conclude that a written report by a licensed physician who has examined the claimant and who sets forth in his report his medical findings in his area of competence may be received as evidence in a disability hearing and, despite its hearsay character and an absence of cross-examination may constitute substantial evidence supportive of a finding by the hearing examiner . . .
Id. at 676, quoting Perales, 402 U.S. at 402, 91 S.Ct. 1420. The Court then stated that even though cross-examination is important in administrative proceedings, reliance on probative evidence such as this medical report, even though technically hearsay, was permitted. This was true even when a party did not have a right to subpoena the person who gave the hearsay report. Stamps, 898 So.2d at 675-76. The opportunity to subpoena a person whose hearsay is relied upon by an agency was one of the justifications in Perales for abandoning the rule that "uncorroborated hearsay" could not be substantial evidence. Perales, 402 U.S. at 402, 91 S.Ct. 1420.
¶ 20. The court distinguished the McLaurin workers' compensation decision that we discussed above, which had refused to allow medical reports to be substantial evidence. The distinction was that the statutes for workers' compensation claims were different than those for public employee retirement. Stamps, 898 So.2d at 675. Not noted by the court were the authorities that we have cited that permit medical records to be substantial evidence in workers' compensation cases.
¶ 21. The near-inconsistency in McLane-Southern of allowing uncorroborated hearsay as evidence, then not letting it be sufficient by itself to support a decision, has been called the "residuum rule." As explained by perhaps the preeminent American authority on administrative law, Professor Kenneth Culp Davis and his co-author Professor Richard Pierce, an agency under that rule could "accept any evidence that is offered, still in the end there must be a residuum of legal evidence to support the claim before an award can be made." II DAVIS & PIERCE, ADMINISTRATIVE LAW TREATISE, § 10.4 (3d ed.1994) at 130 (quoting Carroll v. Knickerbocker Ice Co., 218 N.Y. 435, 113 N.E. 507, 509 (1916)). Professor Davis indicated that the federal government and most states have abandoned the residuum rule: "While a few states continue to adhere to some version of the rule, it does not apply to federal agencies, and it has been abandoned by the [Knickerbocker] court that first announced it." II DAVIS & PIERCE, ADMINISTRATIVE LAW TREATISE, § 10.4 at 129.[2]
*813 ¶ 22. Professors Davis and Pierce state that defects in the residuum rule are "overwhelming," and their reasoning is detailed. Id. at 130-34. In summary, the perceived problems are these: (1) the rule ignores that other evidence admitted without objection is given "its natural probative effect," even if there was a basis on which to exclude that evidence (Meridian Hatcheries, Inc. v. Troutman, 230 Miss. 493, 93 So.2d 472 (1957)); (2) an expert is allowed to base an opinion on inadmissible evidence (M.R.E. 702 & 703); (3) evidence that may be excluded under usual rules is often reliable and probative, such as fruits of an improper search; and (4) reliability of evidence is not a factor of its analytical category but depends on the circumstances leading to the creation of that particular evidence. II DAVIS & PIERCE, ADMINISTRATIVE LAW, at 131.
¶ 23. The authors' basic point is that an alternative rule is far more reasonable. The alternative is to consider all evidence properly admitted under the relaxed standards applicable to administrative agencies, weigh the probative value, reliability, and persuasiveness of each item of evidence, and reach a conclusion without the arbitrariness of also requiring some residuum that would have been admissible under rules of evidence currently applicable in courts. Id. at 130. The important consideration should be the effect of the totality of the evidence and not whether some small piece of that totality would have been admissible under other evidentiary rules.
¶ 24. We understand that regardless of what is occurring in most states and in the federal system, we apply the administrative rules announced by the Mississippi Supreme Court. It is therefore of considerable import that as we have shown, the "uncorroborated hearsay" language has rarely been applied and even less often explained. Moreover, in recent administrative caselaw, hearsay has been held to be admissible if corroborated or if there are "satisfactory indicia of reliability." McDerment v. Miss. Real Estate Comm'n, 748 So.2d 114, 121 (Miss.1999). Of course, that holding focuses on admissibility and not on the residuum rule. However, it is the court's concern for reliability of evidence used by an agency no matter the form of that evidence which we find to be relevant.
¶ 25. It is also important that the residuum rule was not applied in a decision after the 1981 Williams opinion which had held that uncorroborated hearsay alone was not substantial evidence. The Mississippi Supreme Court said that simple lettersnot affidavitsfrom individuals affected by a proposal at the Public Service Commission could be substantial evidence of the interest in the community in the proposed new service. New South Communications v. Answer Iowa, Inc., 490 So.2d 1225, 1227 (Miss.1986). The court did not cite the 1981 Williams decision, but it would be unsurprising to find that this was the precedent that occupied the parties in their arguments. The court's reaction to the suggestion that these letters were not substantial evidence was this:
We find the Commission properly considered the letters from public officials and commercial establishments. This was not a case of great magnitude, the letters simply expressed an interest in having the service New South proposed. It would have served nothing to require New South to secure the personal attendance of these witnesses. If Answer *814 Iowa wanted to rebut such evidence, it was free to offer evidence showing [that there was] no need.
New South, 490 So.2d at 1227. The court said that administrative agencies, not being bound by strict rules of evidence, could consider these documents as substantial evidence. Id.
¶ 26. Finally, at least one precedent allowed unemployment benefits to be denied solely due to a summary of interviews conducted at the first level of claims review. Young v. Miss. Emp. Sec. Comm'n, 754 So.2d 464, 465 (Miss.1999). No hearing was later held when the claimant did not appear. Id. at 465 n. 2. The summary was uncorroborated hearsay, but the court found the employer proved misconduct with substantial evidence. Id. at 467. The opinion reflects the natural credibility that attaches to some hearsay. Indeed, the unsworn interview evidence is the basis for the initial decision on benefits, which is the final decision unless appealed. In Young, the claimant waived offering further evidence.
¶ 27. We list the key components of an analysis of the present condition of the residuum rule in Mississippi administrative practice:
(1) The rule does not apply in Workers' Compensation cases at least to the extent that hearsay medical records, properly authenticated, can be the sole medical evidence;
(2) A 2005 Mississippi Supreme Court opinion stated that hearsay medical records could be substantial evidence in Public Employee Retirement System determinations, and in so holding applied the reasoning of Perales which largely rejected the residuum rule in federal courts;
(3) The residuum rule was not applied in a 1986 decision involving the Public Service Commission, when the contested evidentiary issue was relatively minor in the decision; and
(4) Uncorroborated hearsay is usable as evidence if it has "satisfactory indicia of reliability."
(5) An initial decision on unemployment benefits is based almost entirely on hearsay.
¶ 28. We conclude that the direction of administrative practice has clearly been set. The 1981 Williams decision stated that "uncorroborated hearsay" could not be the sole evidence supporting an administrative decision. Almost never applied by the Supreme Court, that standard has in recent caselaw been abandoned as to the highly probative evidence of medical records and at least once when the fact issue was rather simple. The Williams language, repeated in McLane-Southern, sounds very much like Chief Justice Hughes's 1938 statement that "[m]ere uncorroborated hearsay or rumor does not constitute substantial evidence." That approach has been rejected in Perales by the United States Supreme Court. In 2005, the Mississippi Supreme Court quoted Perales favorably on the use of a certain kind of uncorroborated but probative hearsay as substantial evidence.
¶ 29. It is for the Mississippi Supreme Court to state finally, but we interpret the direction that has been set, as well as the mileposts already reached, to have traveled away from the residuum rule. It appears that if hearsay, even if not corroborated in the traditional sense, is highly probative because it has strong indicia of reliability, it can at least in many situations be substantial evidence. For example, as we concluded in the unpublished precedent that started us today on our analysis, "No case declares that properly admitted, personal knowledge affidavits are never substantial evidence, nor that *815 live testimony from the claimant always trumps affidavits. Proper affidavits can be relied upon to make fact findings even if no corroborative live testimony exists. The fact-finder can reject the affidavits as implausible, properly countered by other evidence, or otherwise uncompelling." Miss. Band of Choctaw Indians, slip op. at 6. If the residuum rule is abandoned, affidavits and other hearsay that constitute more than mere rumor and are not simply idle comments by an absent speaker, are the kind of evidence that may be found sufficiently reliable to constitute substantial evidence by itself and support an administrative agency adjudication.
¶ 30. Since we are the intermediate appellate court, we are in no position to declare the death of Mississippi's residuum rule. Indeed, we may later be told that we exaggerated the indicators of its demise. Accordingly, we examine the evidence here under two different standards. One is the traditional even if not oft-applied requirement that among the collection of evidence used to make findings by an administrative agency, there must be at least one item that is not uncorroborated hearsay. The remainder and even the most compelling of the evidence may be such hearsay. We also examine the evidence by following the direction that we find to be marked by current caselaw. Under that standard, we are not concerned whether there is among all the evidence at least one nugget that fits courtroom evidentiary standards. The focus instead is on whether the totality of the evidence supporting the decision is probative, reliable, and persuasive.
(2) Evidence of McClinton's misconduct
¶ 31. Poor job performance and insubordination were the reasons for discharge. McClinton argues that the evidence to support those claims was all uncorroborated hearsay and focuses on three Rush exhibits. McClinton complains about Exhibit 1, which is a typed sheet of paper listing eight incidents that were documented in McClinton's personnel file from June 17, 2004 through September 16, 2004. This list was not signed and no witness had personal knowledge of the listed incidents. A Rush witness, Tony Gore, the director of diagnostic imaging for Rush, used the list in giving his testimony. It is unclear from the record whether Gore actually prepared the list.
¶ 32. The referee instructed Gore to use the Exhibit 1 list because the documentation and the list contained the same information. That might be true in some ways, but the list gave only the briefest explanations about an incident. For example, for the final event, Exhibit 1 merely stated this: "9-16-04. Wrongly attempted to have a fellow employee (student tech) escorted from the building." At one point, Gore stated to the referee, "I know I'm almost begging you to look at this [documentation to the items listed in exhibit 1], but I've got [ ] a lot of written accounts from a lot of those witnesses, who were present, that actually saw what occurred. I've also got a . . . more detailed description . . . of some of the events that occurred" the week prior to McClinton's being fired. That other documentation with a few exceptions is not in the record. In addition, the testimony referred to incidents during the year preceding the earliest date on Exhibit 1. Three of the eight listed incidents referred to formal complaints submitted against McClinton by other Rush employees using what Gore called a "Quality Control Form," but for some reason he also referred to as a "QCC."
¶ 33. We will look at each incident and analyze what evidence there was of it. Unless otherwise indicated, the evidence *816 was Gore's testimony as he summarized records that were not introduced.
¶ 34. On July 15, 2003, a QCC was submitted that McClinton refused to perform a "stat" procedure in the emergency room until all scheduled procedures were completed. It is our understanding that medical use of the word "stat" is a shortening of statim, Latin for "immediately."
¶ 35. On August 3, 2003, there were two QCC's from the Neonatal Intensive Care Unit that McClinton refused to return x-ray film until ordered through the hospital information system. A department director was called at home in the middle of the night to instruct McClinton to comply.
¶ 36. In the record is a document from January 8, 2004, which explained that even though radiology procedures should generally not be conducted on patients who were not "completely admitted into the HBOC system"a computerized information system at Rushemergency situations allowed that requirement to be relaxed. A handwritten summary of counseling given to McClinton, dated January 14, 2004, was admitted into evidence. He was advised concerning the "policy concerning stat request on patients not in HBO[C] (discussed and understood)." McClinton and his then-supervisor, Mike Smith, both signed the counseling summary. McClinton argues that the only overtly negative comment on this document was a statement that he was counseled about "rudeness by ER nursing staff." McClinton testified that this referred to the nursing staff's rudeness. However, it is much more logical that McClinton would be counseled about complaints by the ER staff of his rudeness. There was ample evidence of McClinton's rudeness.
¶ 37. Gore also testified from his records that on March 10, 2004, a QCC was prepared complaining that McClinton had refused to do a portable x-ray on a new-born child. His stated reason was that the request had not been properly entered in the hospital system. This appears to be a reprise of the January problem regarding McClinton's insistence on an entry into HBOC.
¶ 38. After discussing those earlier incidents, Gore then reached the part of the records that were also summarized on Exhibit 1. On June 17, 2004, a QCC complained that a CT scan had been delayed for two hours because McClinton failed to call the CT technician to notify her of the need for the scan. Something in Gore's records, perhaps the QCC, indicated that the emergency room supervisor asked McClinton why he had not alerted the CT technician and his response was that this was not his responsibility. Gore testified that he met with McClinton after the incident. He testified that McClinton was trained to perform the CT procedure, was paid more due to his training, that McClinton could have performed the procedure himself, and there was no need to wait two hours for the CT technician. McClinton testified that he was not trained to perform the procedure.
¶ 39. On June 20, 2004, the department head for the emergency room prepared a QCC about McClinton's refusal to perform a procedure because it allegedly had not been properly requested through the hospital's information system. Here again, the general policy and the exceptions for the HBOC information system are at issue. The CT technician did the procedure after McClinton refused. As a result of the incident, McClinton was banned from the emergency room. It was at this point in the testimony that Gore urged the referee to review the documentation that he had, but the referee responded that Gore should "just go over that." Gore testified that he and another Rush staff member personally informed McClinton that he *817 needed to be able to perform procedures in the emergency room to be of value to Rush. After a meeting with emergency room staff, McClinton was allowed back in the emergency room.
¶ 40. Gore testified that as a result of the June 20 incident, Gore, McClinton, and McClinton's then-supervisor Donny Smith met to discuss the problem. McClinton was told that unless he could work in the emergency room, he was of little use to the hospital. Smith "challenged" McClinton to meet with the emergency room director and a specific doctor to "get back in their good graces" so that he could go back to work. Gore saw this as a direct order to McClinton, but the latter apparently met only with the nonphysician director and not with the doctor. Gore testified that the director allowed McClinton to return to the emergency room. Only a few days later, an argument between McClinton and a member of the staff and his use of profanity over the telephone caused him to be banned again. He had been told prior to these incidents and would be again that he had to improve his behavior, such as trying to get along with other staff members, or he would be fired.
¶ 41. On July 27, 2004, a QCC alleged that McClinton used profanity with the emergency room staff. The emergency room director wrote that "there seem to be constant problems when Luke [McClinton] works." This complaint was that McClinton had asked for assistance from these nurses because the other x-ray technicians were too busy. Apparently doubting that statement, someone allegedly checked with the technicians and found out that they were not doing anything at all. McClinton was permanently banned from working in the emergency room. On August 16, 2004, the night nurse supervisor made another complaint that there were always problems with McClinton.
¶ 42. On September 10, 2004, three complaints were received from student technicians concerning McClinton's treating them inappropriately. Tammy Martin testified she received the complaints.
¶ 43. The final episode was on the night of September 16-17, 2004. It is due to this incident that McClinton was terminated. McClinton had a verbal altercation with a student technician. He then called security to have the technician escorted from the hospital. A statement from the security guard quoted him as saying that as a supervisor, McClinton had the authority to order this person to leave the hospital. After the guard would not act, Gore and McClinton talked on the telephone. Gore said that no one was to be sent home. McClinton argued that there would be enough people at the hospital even without the student, but Gore refused. McClinton insisted that he was not insubordinate because after his conversation with Gore, he dropped the issue.
¶ 44. Despite McClinton's construction of the facts, there is contrary evidence. At the hearing, Rush Hospital called Tammy Martin, the chief technician, as a witness. Martin testified that on the night of September 16, 2004, the Meridian area was suffering from power outages as a result of Hurricane Ivan. Martin was home without power when she received a phone call from McClinton, who was very angry. McClinton insisted that Martin tell the student technician to leave work or McClinton would have to leave. Martin replied that nobody could go home. McClinton repeated his ultimatum. Martin told McClinton that nobody was to leave, to let the situation drop because everybody was needed on staff that night, and that she would ask Gore to call him. After ending her conversation with McClinton, Martin talked over the telephone with Gore. Gore *818 then called McClinton and instructed everybody to stay at work.
¶ 45. Martin stated that she tried "to calm everything down, because it's a work place [and it was necessary to] keep everything in order." Martin testified that she thought McClinton's tone with her on the phone and the content of his conversation were insubordinate.
¶ 46. The most damning evidence is from McClinton himself. He testified that two student technicians left the hospital to get food at about 7:00 p.m. After the student was gone for about forty-five minutes, which was longer than usual perhaps because of a power outage in Meridian that had closed most restaurants, McClinton testified that he began to try to reach Tammy Martin. It took him another forty-five minutes to reach her. Before McClinton reached Martin, the technicians returned. Gore testified that McClinton was abusive towards both technicians, and one of the students responded sharply to McClinton. After that exchange, McClinton told the student who had responded that he should leave. Taking McClinton's time-line as basically correct, Tammy Martin and McClinton talked at about 8:30 p.m., at which time Martin told him not to do anything until he talked to Gore. At 9:30, the security guard stated in a written report that McClinton sought to have her remove the technician from the hospital. Gore testified that once McClinton telephoned, Gore ordered him not to have anyone escorted from the hospital. It does not matter when McClinton talked to Gore; Martin had ordered him not to have the technician escorted out until talking to Gore, and Gore would eventually tell him to drop the matter. Therefore, McClinton himself indicates, though perhaps unintentionally, that he disobeyed the order. The timeline based on the McClinton's estimates may not be precisely correct, but there is significant evidence that McClinton violated the Martin's direct order that the student technician was to be allowed to complete his shift.
¶ 47. The student technician's written statement was introduced as Exhibit 6. McClinton allegedly confronted him upon his return with food at 8:30. The student wrote that since he "was standing up for myself," McClinton told him to leave and then went to get a guard. Tammy Martin talked to the student later that evening, but there is substantial evidence that she had talked to McClinton not long after the initial confrontation and told him not to have anyone leave.
¶ 48. After the events of September 16, Gore discussed McClinton's situation with the head of the human resources department at Rush. A decision was made to terminate McClinton because of events beginning on July 15, 2003 to the incident on September 16, 2004.
¶ 49. During Gore's testimony at the hearing, he said that in the file he was using were written accounts of the incidents he had described from several witnesses and from the student technician whom McClinton wanted to be escorted out of the hospital. The referee asked McClinton if he had "any objection to these documents showing the details of the incidents in your personnel file, being entered into record?" McClinton responded that he did not. Since the rules of evidence are relaxed, an objection properly could have been rejected. The referee stated that "these documents will be entered into the record as the `Employer's Exhibit #1.'" The Exhibit 1 contained in the appellate record is solely the one-page typed summary of eight of the incidents which Gore used as he was testifying. The transcript is ambiguous as to whether the "documents" accepted into evidence were those in the personnel file or simply the *819 document that summarized what was in the file. With the exception of a written report on the final incident of September 16, 2004, introduced as Exhibit 3which may be a QCC though "Quality Control Form" does not appear on itnone of the QCC's or other documents from the personnel file about the incidents are in the record.
¶ 50. Gore testified as to each of the incidents just described. He was McClinton's supervisor and was aware of the allegations about the incidents as they happened. He counseled McClinton and urged such remedies as the previously described meeting with those in charge of the emergency room. Gore testified that the meeting occurred, McClinton was reinstated, but then was banned again after only a few days. McClinton testified that he had never been reinstated, then banned again. Tammy Martin testified that she never told McClinton that he had supervisory authority. McClinton testified that he had been told he could discipline student technicians but also admitted that all he had explicitly been told was that he was in "charge." Martin testified that she had received complaints from student technicians regarding McClinton's behavior toward them.
¶ 51. There were complaints that McClinton made the student technicians perform all the work. In response, Gore compared McClinton's work to that of other technicians. McClinton's procedures were well below the average number for all technicians. After complaints that McClinton watched television while student technicians performed the work, Gore performed a spot check on McClinton and found him watching television. McClinton testified that technicians were allowed to watch television when there was no work to be completed, but student technicians complained that McClinton neglected his work due to watching television. Gore also testified that he personally had numerous discussions with McClinton that McClinton needed to get along with others and improve job performance or face termination. McClinton denied having such conversations with Gore.
¶ 52. Additional evidence introduced to support the misconduct was Exhibit 3, which is a handwritten statement of the security guard concerning the altercation between McClinton and a student technician on September 16. The security guard did not testify. The written report described McClinton as very upset, that he wanted the student technician escorted from the building, and that he took the guard to the place where the other employee was seated. The report recounts that the guard asked for the name of the person in charge of radiology, and was given Gore's name. The guard told McClinton to contact Gore and have him contact hospital security.
¶ 53. The final challenged document was Exhibit 6. It is the already discussed handwritten statement of the student technician whom McClinton instructed to leave on September 16. The description of the incident on this exhibit basically conforms to the testimony of Gore and Martin about what had happened, and details the basis of the altercation with McClinton.
¶ 54. McClinton testified that he was aware of the hospital's regulations and policies. He admitted that he was banned from working in the Rush emergency room and that this caused him to have low production numbers. McClinton testified that he was never told that he had authority to discipline student technicians. He admitted that he did not contact his immediate supervisor when he encountered a problem with the student technician but chose to contact hospital security. McClinton also testified that during his conversation with *820 his supervisor Martin, McClinton told her that either he or the student technician should clock out.
¶ 55. This was the evidence. As indicated earlier, the final agency decision found that McClinton was discharged for poor job performance and for insubordination.
¶ 56. Poor job performance is a clear enough concept, but the legal meaning of insubordination needs to be explained. Since it is a form of misconduct, we examine what qualifies as misconduct. For purposes of unemployment compensation, misconduct has been defined this way:
conduct evincing such willful and wanton disregard of the employer's interest as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect from his employee. Also, carelessness and negligence of such degree, or recurrence thereof, as to manifest culpability, wrongful intent or evil design, and showing an intentional or substantial disregard of the employer's interest or of the employee's duties and obligations to his employer, came within the term. Mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, or inadvertences and ordinary negligence in isolated incidents, and good faith errors in judgment or discretion were not considered "misconduct" within the meaning of the statute.
Wheeler v. Arriola, 408 So.2d 1381, 1383 (Miss.1982).
¶ 57. The Department has established guidance for appeal referees and others in resolving claims. That guidance appears in a manual that has not been promulgated through rule-making procedures but is intended to be a summary of court precedents and other useful references for the agency. After quoting the Wheeler definition, the guidance also provides this:
An employee shall not be found guilty of misconduct for the violation of a rule unless: (1) the employee knew or should have known of the rule; (2) the rule was lawful and reasonably related to the job environment and job performance; and (3) the rule is fairly and consistently enforced.
MISS. EMP. SEC. COMM'N, BENEFIT PROCEDURAL HANDBOOK, § 2 F. (2) (Rev.1995).
¶ 58. Introduced into evidence were pages from the hospital's employee manual. In the manual, Rush provided that it had a right of immediate termination for poor work performance, "including incompetency or inefficiency." Though it may be a basis for termination, a poor job performance is not usually so severe that it sinks to the level of wanton disregard of the employer's interests.
¶ 59. For purposes of unemployment benefits, insubordination is a form of misconduct. Young v. Miss. Emp. Sec. Comm'n, 754 So.2d 464, 466-67 (Miss. 1999). Insubordination is "constant or continuing intentional refusal to obey a direct or implied order, reasonable in nature, and given by and with proper authority." Shannon Eng. & Const., Inc. v. Miss. Emp. Sec. Comm'n, 549 So.2d 446, 449 (Miss.1989). The issue for insubordination often is whether there was a constant and continuing refusal or whether there was just an isolated incident. Gore v. Miss. Emp. Sec. Comm'n, 592 So.2d 1008, 1010 (Miss.1992). A single incident is usually insufficient to be disqualifying. Id.
¶ 60. This is the relevant finding by the Board of Review:
These facts show that the claimant was discharged for poor job performance and insubordination. The employer *821 had met with the claimant to discuss his job performance and complaints of rudeness to other employees. The claimant was involved in a verbal altercation with another technician. Rather than reporting the matter to management, the claimant told the technician to clock out and go home. The claimant was advised that he was not to send anyone home. It is the opinion of the Board of Review that the claimant's actions did violate a standard of behavior that the employer had a right to expect. His actions showed a substantial disregard of the employer's interest and his duties and obligations to the employer.
¶ 61. We do not understand the Board of Review to have found that McClinton's alleged poor job performance disqualified him from benefits, but it found that he was terminated in part for a poor performance. In this case, misconduct must be found before benefits would be disallowed. The Board found that McClinton's seeking to have the student technician removed from the hospital constituted "a substantial disregard of the employer's interests" and his act was insubordination.
¶ 62. We now examine whether the facts in the record support the occurrence of insubordination by substantial evidence. The evidence is largely hearsay that McClinton had frequent problems with co-workers and supervisors. The file from which Gore was testifying apparently had significant documentation of the events underlying the various complaints, though those documents would almost certainly have been hearsay. Gore had firsthand knowledge of McClinton's poor job performance, based on his review of records of different procedures. If the referee actually admitted some of the documents, they do not appear in the appellate record.
¶ 63. Had these documents been in evidence, the case would be fairly strong that credible and probative evidence existed of the kind generally relied upon when reviewing the history of a person's employment. This credible evidence was hearsay, but it was the kind of hearsay evidence that would have been admissible in court. The personnel file was a record from a "regularly conducted activity," offered through "testimony of the custodian or other qualified witness" at the hearing. M.R.E. 803(6). Generically, personnel records fit the definition of business records set out in Rule 803(6). To the extent prior judicial acceptance is analytically useful, we acknowledge finding no Mississippi caselaw addressing the issue. Federal courts have applied their identical rule to personnel records. E.g., Todd v. Schomig, 283 F.3d 842, 853-54 (7th Cir.2002) ("Todd's employment records . . . with marginally additional foundation could have qualified under the business records exception to the hearsay rule. Fed. R.Evid. 803(6))"; Martin v. Funtime, Inc., 963 F.2d 110, 116 (6th Cir.1992) ("it is certain the personal records would be admissible under Fed.R.Evid. 803(6) as business records. The records in this case were compiled by Funtime or its employees; were kept in the course of a regularly conducted business activity, i.e. personnel management; and, it was the regular practice of Funtime to keep such records.") Many of the records that we have summarized here were based on the first-hand knowledge of the person filing a QCC or who provided other evidence about McClinton. Each such record reflects the personal knowledge of the preparer. M.R.E. 803(6) cmt.
¶ 64. Hearsay evidence that would have been admissible at a civil trial and fully usable by a fact-finder is not "uncorroborated hearsay" under the residuum rule. The indicia of trustworthiness that allows the evidence to be admitted *822 through a hearsay exception is the equivalent of "corroboration." The fact that the actual documents do not appear in the appellate record does not undermine their use in the decision. They were offered, McClinton did not object, and we find indications that they were actually admitted. Regardless, their substance for our purposes was related through the testimony of their custodian Gore. Enough of the evidence is in the record to qualify the total as substantial.
¶ 65. The Board of Review found McClinton disqualified from receiving unemployment benefits because of insubordination. As indicated previously, there usually must be more than one instance of refusal to obey a clear directive before benefits may be withheld. Gore, 592 So.2d at 1010. The effort to have the student technician ejected from the hospital has already been described. There is substantial direct evidence from personal knowledge that McClinton sought to have the student technician removed even after being explicitly told not to do so. Almost all of that evidence is from the testimonial summary of valid business records or from witnesses such as McClinton himself. Though Martin was not McClinton's direct supervisor, there is no question that she was in a position of sufficient authority over him that disobeying her reasonable orders was insubordinate conduct. The disobedience is substantially supported.
¶ 66. We now look for substantial evidence of prior insubordination. Many of the earlier events indicated a lack of diligence and an inability to get along with others. There is also evidence, though, concerning McClinton's continuing refusal to comply with the policy on the exceptions to use of the HBOC system in which hospital information was computerized and requests for procedures inputted. For "stat" procedures, there was a need for flexibility. On January 8, 2004 a new policy was announced. After immediate problems with McClinton, he was counseled on January 14 about the policy. Despite that counseling, there were several subsequent incidents where he refused to conduct procedures or make arrangements for others to do so because the requests were not in the HBOC system. Here too the evidence is substantial.
¶ 67. To some extent, additional insubordination is shown by the evidence that McClinton was unable to adapt his personal conduct to the demands of his supervisors that he get along with his coworkers. What causes sharp argument and profanity to be used in a professional environment can be disputed. However, the frequency of complaints about McClinton's rude conduct certainly qualifies as evidence on which the Board of Review could rely that he was failing to make a good faith effort to respond to the demands of his supervisors on how his treated coworkers.
¶ 68. Regardless of whether the residuum rule is applied or not, there was substantial, credible, corroborated evidence of McClinton's multiple acts of insubordination. There may have been better evidence in the proceedings than what made it into the appeal record. It is the obligation of each party to have a sufficient record for us to resolve its issues. Riley v. Town of Lambert, 856 So.2d 721, 724 n. 1 (Miss.Ct.App.2003) (citing Queen v. Queen, 551 So.2d 197, 199 (Miss.1989)). The summaries of the personnel records provided by the supervisor who had the records in his possession were adequate. That testimony revealed that many of the relevant records were based on the personal knowledge of the preparer of the individual complaints.
¶ 69. We affirm.
*823 ¶ 70. THE JUDGMENT OF THE LAUDERDALE COUNTY CIRCUIT COURT IS AFFIRMED.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS AND ISHEE, JJ., CONCUR. BARNES, J., CONCURS IN RESULT ONLY. ROBERTS, J., NOT PARTICIPATING.
NOTES
[1] The U.S. Supreme Court adopted a rule, effective on December 1, 2006 unless Congress disapproves, that unpublished federal court opinions may be cited. F.R.A.P. 32.1. There are reasonable policy arguments on each side of the issue of parties' using unpublished opinions.

A different set of considerations applies to barring use by the court that issued the opinion. Words when repeated in a later opinion become the holding or, perhaps, dicta of the court. No particular combination of words that it chooses to explain itself, even if those exact words have been used before, need to be automatically barred. Not reusing the unpublished word "cat" and now having to say "feline" is the virtual and unnecessary effect. Unlike use by a litigant, a court's embrace of nonauthoritative analysis such as in a treatise, another state's precedent, or the court's own unpublished opinion, gives the court's imprimatur to the prior words. Use bestows authority.
Regardless of the broader issue, we are permitted to consider an unpublished opinion "upon an issue such as . . . collateral estoppel. . . ." M.R.A.P. 35-B (b) (emphasis added). This Court's unpublished Choctaw opinion has continued to be consulted by the governmental agency that was a party, an agency that must conduct hearings in a manner consistent with judicial guidance. An agency acting in good faith may well decide that it should not ignore direction given to it even in an opinion that is not precedent. A court's reexamination, revision and/or restatement of the guidance will tell the agency whether it should still comply with the earlier direction.
[2] The latest edition of the treatise was not co-edited by the late Professor Davis, who died in September 2003. The current edition leaves these observations and conclusions undisturbed. II PIERCE, ADMINISTRATIVE LAW TREATISE, § 10.4 (4th ed.2002).