# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-CC-01347-COA

JASON ALSTON                                                    APPELLANT

v.

MISSISSIPPI DEPARTMENT OF                                        APPELLEE
EMPLOYMENT SECURITY

DATE OF JUDGMENT:              08/26/2016
TRIAL JUDGE:                   HON. JOSEPH H. LOPER JR.
COURT FROM WHICH APPEALED:     ATTALA COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:        JASON ALSTON (PRO SE)
ATTORNEYS FOR APPELLEE:        ALBERT B. WHITE
                               ANNA CRAIN CLEMMER
NATURE OF THE CASE:            CIVIL - STATE BOARDS AND AGENCIES
DISPOSITION:                   AFFIRMED - 11/28/2017
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**BARNES, J., FOR THE COURT:**

¶1.     Jason Alston, appearing pro se, appeals the decision of the Circuit Court of Attala

County, which affirmed the decision of the Board of Review (Board) of the Mississippi

Department of Employment Security (MDES) denying him unemployment benefits. The

Board adopted the MDES administrative law judge's (ALJ) determination that Alston

voluntarily left his employment without good cause. Finding there was substantial evidence

to support the Board's decision, we affirm.

### STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2.     Alston had been employed with the Mississippi Department of Transportation

(MDOT) as a Maintenance Tech II from September 1, 2012, to October 26, 2015, first in Pearl, Mississippi, and then in Kosciusko, Mississippi, where he resigned from his job. Alston claims he was forced to resign due to workplace harassment by his coworkers and supervisors. He cites several incidents to support his claim. Alston also received several work-related reprimands and was ultimately suspended from work for four days. When Alston returned to work, he informed his supervisor that he was leaving for another job. Alston then applied for unemployment benefits, claiming he was constructively discharged due to a hostile work environment.

¶3.    MDES denied Alston's claim. Alston appealed. After a hearing, an MDES ALJ determined that he had not been subject to a hostile work environment, but had quit voluntarily, and failed to show good cause in doing so. Alston appealed to the Board, which adopted the ALJ's findings. Alston then appealed to the circuit court, which affirmed the Board's decision.

¶4.    At the hearing before the ALJ, the attorney for MDOT, Joe Goff, had two witnesses testify – Marty Price, maintenance-operations manager and Alston's direct supervisor, and Greg Franklin, MDOT's district human-resources manager. Alston had no witnesses other than himself.

¶5.    Alston claimed he gave his employer notice that he was quitting due to a hostile work environment, which began on January 8, 2015. On that date, he inadvertently put the wrong fuel in an MDOT diesel truck. He claimed a coworker forced him to siphon gas out of the tank by mouth or receive a written reprimand. He siphoned the gas by mouth, subsequently

2

became sick, and went to the ER. Alston did not report his illness for workers'-compensation purposes until approximately one week later. Price, however, testified that Alston was given the option by their mechanic of dropping the tank and draining it, or siphoning the gas.

¶6. Additionally, in April 2015, Alston claimed Morgan Henry, a local maintenance supervisor, started a rumor among other employees that Alston had HIV. This incident arose when Alston asked Henry for time off to go to a physician for symptoms he received from his girlfriend. Upon his return, coworkers said he had HIV. Alston denied discussing with any coworkers that he may have a sexually transmitted disease. Alston then filed a grievance against Henry.

¶7. Another incident occurred in July 2015, when Keith Mangrum, a coworker, killed a water moccasin on the job and threw it in the back of Alston's work truck. Alston asked Mangrum to remove it because he was terrified of snakes, and he could not finish his work assignment because his equipment was in the back of the truck with the dead snake. Alston, though, admitted the incident was eventually addressed. Human resources was notified, and Price and Goff offered to transfer Mangrum to another district. Alston agreed, and Mangrum was transferred.

¶8. Alston testified to other more-minor incidents with Mangrum before he was transferred for the snake incident. In March 2015, Alston claimed Mangrum intentionally jerked Alston's steering wheel, causing Alston to spill his coffee on his lap. Alston requested a transfer to another district but stated Henry asked him to stay. The next day, on

March 5, 2015, Alston filed grievances against Henry, Price, and Mangrum.[1] Price testified he spoke to Mangrum about "horseplay." Alston also alleged that Mangrum encouraged another coworker to ram an MDOT tractor into Alston's MDOT truck. The coworker refused, but Alston called Price and reported the incident. Price and Henry immediately came to the scene and investigated. Price testified about the incident, explaining Mangrum's comment was not intentional, but a miscommunication.

¶9.     Further, in May 2015, Alston stated another employee tried to start a fight with him; so he filed a grievance against him. Both Price and Goff investigated the incident by interviewing both parties, as well as a witness, but the witness and alleged instigator denied Alston's accusations. Alston admitted that steps were taken to resolve the issues between the two men.

¶10.     Alston explained he had "no issue" with his job at MDOT until he transferred districts, from Pearl to Kosciusko, in August 2014. Alston testified that he filed his complaints and grievances against his supervisors and coworkers according to the employee handbook, but claimed none of the incidents were "handled." Therefore, in June 2015, he filed an Equal Employment Opportunity Commission (EEOC) charge of discrimination based on race and disability, claiming harassment by white coworkers. In July 2015, he filed another EEOC charge, claiming employer retaliation due to his first claim. He stated that since his first filing he had "been consistently written up for violations that were not [his] fault."

---

[1] Alston never advanced his grievances against supervisors and coworkers beyond the initial filing.

¶11.    Between the time of the two EEOC filings, however, Alston was admitted to St. Dominic Behavior Health hospital for four days, from June 30, 2015, until July 2, 2015. He testified that workplace retaliations had caused him to have a nervous breakdown and "forced [him] to quit" (although he quit approximately three months later). Alston's diagnosis was depression and psychosis. He claimed counselors at St. Dominic told him to return to work and "deal with his problems head on; people were going to pick and mess with him daily." He was off work for three weeks, but did not provide MDOT with any records regarding his hospitalization.

¶12.    A hand-delivered letter to Alston dated September 25, 2015, from MDOT's executive director, entitled "Disciplinary Action Notice," was entered into evidence. It summarized four Group II offenses against Alston that required a written reprimand. In May 2013, Alston received a reprimand for violating safety rules. In June 2015, Alston received two written reprimands for insubordination.[2] In early June 2015, he received a written reprimand for "speeding and operating a state vehicle in an unsafe manner placing other employees in a life threatening situation." On June 19, 2015, Alston received a written reprimand for improper placement of highway "mowers ahead" warning signs on three different days.[3] Finally, the letter detailed the circumstances of September 9, 2015, when Alston again

_____

[2] The letter cited the Mississippi state-employee handbook, stating "insubordination" included, but was "not limited to, resisting management directives through actions and/or verbal exchange, and/or failure or refusal to follow supervisor's instruction, perform assigned work, or otherwise comply with applicable established policy."

[3] Alston accused a coworker and his supervisors of training him improperly on sign placement so he would be written up.

5

improperly placed warning signs on the wrong side of a highway, endangering mowers and resulting in another insubordination offense. Additionally, but not documented in the notice, in September 2015, Alston was issued a reprimand for failing to follow a directive by Price instructing employees not to use cell phones at work except as necessary. Alston acknowledged at the hearing that, according to the employee handbook, two Group II offenses per year entitled MDOT to discipline him up to discharge; however, he was only suspended from work without pay from September 29 through October 5, 2015. Alston claimed to have sent the Mississippi Employee Appeals Board a letter appealing his suspension, but it was never received, and he never contacted MDOT about an appeal.

¶13.   Alston told Price he had started looking for another job around the time of his suspension, but it is unclear whether Alston returned to work after his suspension. On October 19, 2015, Alston stated he called Price and asked for time off work in order to take a drug test, and if he passed the test he was going to start work at Prairie Farms Dairy immediately. Price told Alston he needed to complete MDOT's exit forms. Alston denied that, as Price claims, he signed the forms that day and noted the "reason(s) for voluntary resignation" was "to accept another position (ready & waiting)."[4]   The next day, for unrelated reasons, human resources revised the form format, and Price asked Alston to complete another one.

¶14.   On October 26, 2015, Alston returned to Price's office accompanied by his father. He completed the new form and his exit interview. On the new form, Alston checked the

---

[4] Alston attributes the form discrepancy to the "criminal conspiracy" by MDOT against him.

6

reason for his voluntary resignation was "dissatisfied (salary, hours, work)." In a box for additional details, he wrote: "due to constructive discharge tactics used regularly by my supervisors, I am forced to resign my position. See EEOC cases pending." He also requested that he take the old form so he could destroy it himself. Alston admitted there were no formal disciplinary actions pending against him and no new reprimands. He also told several coworkers he was leaving because he had a new opportunity to make more money and have better hours at the dairy.

¶15. At the ALJ hearing, Price denied having any discussions with Alston about leaving due to a hostile work environment. Price claimed the only hostile incident involved the snake, and action was taken against the instigator – Mangrum – by transferring him. Price acknowledged that Alston had come into his office crying on the day of the snake incident. However, Price testified that each incident was addressed to Alston's satisfaction. Further, Price stated Alston was not treated differently from any other employees. Price sat in on an interview with several of Alston's coworkers concerning reasons why he left. Present was an attorney for MDOT human resources and four employees, who all stated Alston had informed them he was leaving MDOT for the dairy to make more money.

¶16. Franklin, the district human-resources manager, testified last. He stated Alston resigned to accept a job at a local dairy. He testified that during the gas incident, Alston was given the choice of siphoning or draining the gas. Franklin confirmed that Price handled the grievance procedures properly. Franklin also corroborated Price's testimony about the exit forms, and that Alston changed his reason for leaving to constructive discharge on the

7

second form. Finally, he was not aware of any complaints or issues Alston had regarding a hostile work environment.

¶17.    Alston's date of separation with MDOT was October 26, 2015.[5]  Alston applied for unemployment benefits on November 12, 2015.

## STANDARD OF REVIEW

¶18.    This appeal is governed by Mississippi Code Annotated section 71-5-531 (Supp. 2016), which provides that if the findings of the Board are supported by substantial evidence and absent of fraud, they are conclusive, and the appellate court's review is "confined to questions of law." *Id.*  An administrative agency's conclusions will remain undisturbed unless the agency's order is: (1) unsupported by substantial evidence, (2) arbitrary and capricious, (3) beyond the scope or power granted to the agency, or (4) in violation of the employee's statutory or constitutional rights. *Miss. Dep't of Emp't Sec. v. Good Samaritan Pers. Servs.*, 996 So. 2d 809, 812 (¶6) (Miss. Ct. App. 2008) (citing *Miss. Comm'n on Envtl. Quality v. Chickasaw Cty. Bd. of Supervisors*, 621 So. 2d 1211, 1215 (Miss. 1993)).  "A rebuttable presumption exists in favor of the administrative agency, and the challenging party has the burden of proving otherwise." *Allen v. Miss. Emp't Sec. Comm'n*, 639 So. 2d 904, 906 (Miss. 1994).  The reviewing court "must not reweigh the facts of the case or insert its judgment for that of the agency." *Id.*  If the Board's findings are supported by substantial evidence and the relevant law is properly applied, the reviewing court must affirm. *Barnett*

---

[5] Alston subsequently worked at Prairie Farms Dairy from October 27 until November 5, 2015, but stated he was "discharged for no reason."  He submitted an EEOC claim against the dairy for retaliation as well.

*v. Miss. Emp't Sec. Comm'n*, 583 So. 2d 193, 195 (Miss. 1991).

## ANALYSIS

¶19.    Alston argues that the ALJ and Board's ruling that he voluntarily quit his employment without good cause was not supported by substantial evidence, and was arbitrary and capricious. He also claims that his due-process rights were violated when his ALJ hearing was postponed one month.[6]

**Substantial Evidence**

¶20.    Under Mississippi law, a worker is disqualified from receiving unemployment benefits if he "left work voluntarily without good cause . . . ." Miss. Code Ann. § 71-5-513(A)(1)(a) (Supp. 2016). The burden of proving good cause rests with the employee. Miss. Code Ann. § 71-5-513(A)(1)(c). The Mississippi Supreme Court "has held on numerous occasions that the question of whether an employee voluntarily quits or was discharged is a question of fact for the ALJ and Board to determine." *Huckabee v. Miss. Emp't Sec. Comm'n*, 735 So. 2d 390, 394 (¶14) (Miss. 1999). However, their decision must be based on substantial evidence. *Id.* "Substantial evidence" is evidence that is relevant and capable of supporting a reasonable conclusion, or "more than a mere scintilla of evidence." *Johnson v. Miss. Dep't of Envtl. Sec*, 150 So. 3d 149, 152 (¶8) (Miss. Ct. App. 2014).

¶21.    The ALJ made the following findings of fact to support her determination that Alston

---

[6] Alston filed a self-styled "Petition for a Mandamus" with the Mississippi Supreme Court on October 6, 2016, before his case was assigned to this Court, raising several issues addressed by this opinion. He also filed a motion to amend the petition, which was granted by the Mississippi Supreme Court. The issues Alston raised in his petition have been considered and resolved by either this opinion or by order of this Court.

voluntarily quit his employment without good cause. MDOT representatives stated that Alston told them he was voluntarily quitting to take a position at Prairie Farms Dairy. Other employees stated that Alston told them he had accepted another job because it provided a new opportunity with better hours and more money. On the original exit documents Alston completed on October 19, 2015, he allegedly noted the reason for leaving was to take another job ready and waiting. When MDOT asked Alston to reexecute a newer version of the exit form, he made sure the first form, which stated he left to take another job, was destroyed. On the new form he indicated his departure was a "constructive discharge."

¶22. As far as the incidents with Alston's coworkers, MDOT countered that its human-resources department had reacted to each of Alston's complaints in a timely manner, investigating each allegation. Employees involved with any of the incidents in violation of MDOT's policies were properly disciplined. And, at the time, Alston stated he was satisfied with the discipline implemented.

¶23. Regarding Alston's own disciplinary infractions, MDOT pointed out that Alston had received numerous warnings and a suspension during his tenure at MDOT. Alston could have been dismissed after two Group II violations, but instead, MDOT gave him more chances to improve his behavior. Alston, however, believed these violations were unfounded and based on discrimination and retaliation for his EEOC complaint.

¶24. The ALJ concluded that Alston left MDOT due to his four-day suspension and obtaining a better job at the dairy – not a hostile work environment. The ALJ cited the legal principle that when an individual leaves work after a disagreement with the employer, under

10

no threat of discharge, he is deemed to have voluntarily left the employment without good cause. *Miss. Emp't. Sec. Comm'n v. Fortenberry*, 193 So. 2d 142, 144 (Miss. 1966). The ALJ accordingly found:

> [Alston] left work after he had been suspended for an incident that he deemed not to be his responsibility, in essence disagreeing with [MDOT's] decision to hold him accountable. He had previously received proper disciplinary actions in accordance with [MDOT's] policies but he was under no threat of immediate discharge.

¶25. After thoroughly reviewing the record, we find there was substantial evidence to support the Board's findings that Alston voluntarily left his employment for another job without good cause. His coworker's harassing incidents, while inappropriate, were all dealt with by supervisors to Alston's satisfaction. The snake and coffee incidents instigator, Mangrum, was transferred to another district. Alston was given the opportunity to drop the tank to remove the gas, but chose to siphon it by mouth. Supervisors investigating the truck-ramming incident and attempted fight discovered accounts that conflicted with Alston's version. Supervisors suspended Alston for numerous reprimands that could have resulted in his firing. There was testimony from a coworker to contradict Alston's contention that he was intentionally told to place signs in incorrect areas. Alston was diagnosed with depression and psychosis, but did not provide evidence, except his own testimony, that his mental health was directly related to his work, and "forced him to quit." Further, he stated he was told by mental-health professionals to return to work and face his problems. Evidence showed Alston quit MDOT to work at the dairy for a better job with more pay, which ultimately did not work out. Multiple coworkers who were interviewed stated Alston

11

told them he quit to take the job at the dairy. Price testified that Alston took time off to take a drug test for a new job. Both Price and coworkers claimed Alston made no mention of a hostile work environment at MDOT.

¶26. Whether Alston left work with good cause is an issue of fact left to the fact-finder.[7] Alston claims his intolerable working conditions created good cause for his resignation. *See Hoerner Boxes Inc. v. MDES*, 693 So. 2d 1343, 1346 (Miss. 1997) (finding as an issue of first impression sexual harassment can constitute good cause for unemployment-benefits purposes). Here, the Board, as the trier of fact, could well have determined that MDOT was aware of the harassing incidents and addressed them to Alston's satisfaction.

¶27. The Board's conclusion that Alston was not constructively discharged is not arbitrary and capricious. Constructive discharge occurs when "the employer [has] made conditions so intolerable that the employee reasonably [feels] compelled to resign." *Bulloch v. Pascagoula*, 574 So. 2d 637, 640 (Miss. 1990) (citation omitted). From the record, MDOT supervisors were attentive in addressing Alston's grievances and trouble-making coworkers. This issue is without merit.

**Due Process**

¶28. Alston alleges that the trial court erred in finding his due-process rights were not violated when his initial hearing was postponed.[8] He requests a new hearing or a decision

---

[7] Here, the Board, which is the finder of fact, adopted the findings of the ALJ. *See* Miss. Code Ann. § 71-5-531.

[8] Alston also argues a denial of due process because of numerous minor formatting errors with the ALJ's and Board's decisions. He claims the Board's decision lacks headings, and therefore must be a "false document." He also claims in his mandamus petition that

12

in his favor. Alston reasons that the continuance did not follow proper administrative regulations because no good cause was cited for granting the continuance.[9] Originally, the ALJ hearing was set for February 10, 2016, but it was cancelled because the attorney for MDOT could not appear on that date. The ALJ hearing was subsequently re-noticed and held on March 11, 2016. Both the cancellation and the re-notice were mailed to Alston on February 1, 2016, and February 16, 2016, respectively, and both MDOT and Alston participated in the rescheduled hearing.

¶29. Alston's argument is without merit. Administrative proceedings are to be "conducted in a fair and impartial manner, free from any just suspicion or prejudice, unfairness, fraud, or oppression." *Miss. State Bd. of Health v. Johnson*, 19 So. 2d 445, 447 (Miss. 1944). Further, it is well established that formal rules of practice, procedure, and evidence are more relaxed in proceedings before administrative agencies than in courts of law; however, "[d]ue

---

because the Board's decision lacks a signature or a stamp, it is void. We find no formatting errors in the decisions, and no indication the Board's decision is fraudulent because it lacks a signature and stamp. These claims are without merit.

Additionally, he argues that on June 6, 2016, he was denied access to inspect personally the Board's decision, record, and files on his claim at MDES. However, the record on appeal indicates Alston was properly provided all decisions and notices to which he was entitled.

Finally, Alston argues that the circuit-court judge should have granted his motion to recuse, because the same judge accepted Alston's March 1999 guilty plea for burglary of a dwelling and has a "vendetta" against him. The judge denied his motion because he had no independent recollection of these proceedings. Moreover, the judge stated he would not consider the conviction while ruling on the merits of Alston's appeal.

[9] Alston cites MDES Regulations 20-1-101:200.02 of the Mississippi Administrative Code regarding scheduling of hearings before the Appeals Department.

13

process always stands as a constitutionally grounded procedural safety net in administrative hearings." *McGowen v. Miss. State Oil & Gas Bd.*, 604 So. 2d 312, 318 (Miss. 1992). The minimum due-process requirement an administrative board must afford parties is notice and an opportunity to be heard. *Booth v. Miss. Emp't Sec. Comm'n*, 588 So. 2d 422, 428 (Miss. 1991) (citing *State Oil & Gas Bd. v. McGowan*, 542 So. 2d 244, 248 (Miss. 1989)).

¶30. Alston provides no authority for his claim that his due process was violated because his ALJ hearing was postponed approximately one month. The circuit court found, and the record confirms, that Alston was given notice of both hearing dates. Moreover, he was able to attend, testify, and cross-examine witnesses. Accordingly, Alston received procedural due process of notice and a hearing. Furthermore, the hearing was fair and impartial.

### Improper Evidence

Finally, Alston alleges in his petition for mandamus that MDOT engaged in misconduct by presenting improper evidence during the hearing before the ALJ, because it was not timely disclosed. He cites two documents in the record before the MDES in support of his contentions. The first page is a cover letter from MDOT attorney Goff to the ALJ dated March 7, 2016. Goff attaches sixteen pages of exhibit documents to be entered as evidence during Alston's telephonic ALJ hearing on March 11, 2016. The documents include a completed and uncompleted exit-interview form, as well as MDOT memoranda, emails, and reprimands dealing with Alston and his claims. We find no merit to Alston's argument that these documents were improperly admitted or untimely.

### CONCLUSION

14

¶31.   The decision of the circuit court is affirmed.

¶32.   **AFFIRMED.**

**LEE, C.J., FAIR, WILSON AND GREENLEE, JJ., CONCUR. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY IRVING AND GRIFFIS, P.JJ., AND WESTBROOKS, J.  TINDELL, J. NOT PARTICIPATING.**

**CARLTON, J., DISSENTING:**

¶33.   I respectfully dissent.  The issue in this case pertains to whether Alston presented sufficient proof of good cause to leave work.  Upon review of the record and applicable precedent, I submit that Alston met his burden of showing that his departure was based upon good cause, and, therefore, he should not be denied unemployment benefits.[10]  *See* Miss. Code Ann. § 71-5-513(A)(1)(c) (Supp. 2016) (employee bears burden of proving employee has left work for good cause).  Alston claims that he was constructively discharged, and that he possessed good cause to leave work due to intolerable work conditions.

¶34.   The record reflects that Alston was forced to siphon gas with his mouth from the gas tank of a truck, a coworker put a dead snake in his truck, and while driving a truck with Alston as a passenger, that same coworker caused Alston to spill hot coffee on himself. Also, another coworker threatened to fight Alston, and his supervisor told other employees Alston's personal medical information and spread rumors to other employees that Alston had HIV.

---

[10] *See Sherman v. Miss. Emp't Sec. Comm'n*, 989 So. 2d 398, 401-02 (¶¶9-10) (Miss. 2008) (finding good cause for leaving job due to refusal to price gouge after Hurricane Katrina); *Hoerner Boxes Inc. v. Miss. Emp't Sec. Comm'n*, 693 So. 2d 1343, 1347 (Miss. 1997) (addressing good cause and finding that sexual harassment constituted good cause); *Miss. Dep't of Emp't Sec. v. Trent L. Howell PLLC*, 46 So. 3d 827, 831-32 (¶¶21-26) (Miss. Ct. App. 2010) (finding sexual harassment constituted good cause).

¶35. The MDOT, Alston's employer, does not dispute that the harassing conduct occurred; however, MDOT argues that corrective action was taken against the employees found to be in violation of MDOT's policies regarding their interactions with Alston. MDOT claimed that each incident was resolved to Alston's stated satisfaction at that time. MDOT further alleged that Alston had received multiple warnings and a suspension from work based on his own behavior. MDOT stated that Alston's violations of MDOT policies left him subject to dismissal, but MDOT chose to give Alston an opportunity to correct his behavior rather than dismiss him. MDOT also claimed that Alston informed other employees that he had accepted another job since it provided a new opportunity with better hours and more money.

¶36. However, I submit that Alston was not required to work under such intolerable conditions or return to work where such an invasion of his private medical information had already occurred, clouding his ability to continue under such stigmatized circumstances.

¶37. Based upon the foregoing, I respectfully dissent.

**IRVING AND GRIFFIS, P.JJ., AND WESTBROOKS, J., JOIN THIS OPINION.**