# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-SA-01620-COA

**MISSISSIPPI STATE BOARD OF NURSING**  **APPELLANT**

**v.**

**ROBIN MACK**  **APPELLEE**

DATE OF JUDGMENT: 09/26/2019
TRIAL JUDGE: HON. JAMES CHRISTOPHER WALKER
COURT FROM WHICH APPEALED: MADISON COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT: BRETT B. THOMPSON-MAY
ATTORNEY FOR APPELLEE: ADRIENNE P. PARKER
NATURE OF THE CASE: CIVIL - STATE BOARDS AND AGENCIES
DISPOSITION: AFFIRMED - 06/15/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE BARNES, C.J., WESTBROOKS AND SMITH, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1.     This appeal stems from a complaint filed by the Mississippi State Board of Nursing (Board of Nursing) against Robin Mack, a nurse practitioner employed at the G.V. (Sonny) Montgomery Veterans' Administration Medical Center (VA). The complaint charged Mack with two violations: (1) negligently or willfully practicing nursing in a manner that failed to meet generally accepted standards of nursing practice, and (2) falsifying or negligently making an incorrect entry on records, in violation of Mississippi Code Annotated section 73-15-29(1)(e) and (g) (Rev. 2012), respectively.[1] After an administrative hearing before a

---

[1] This Code section provides for nursing license denial, revocation, or suspension:

(1) The board shall have power to revoke, suspend or refuse to renew any

three-member panel of the Board of Nursing, Mack was found guilty of the two charges, and her registered nursing license was placed on probation for a minimum of twelve months. Mack appealed. Following a hearing before its full membership, the Board of Nursing voted to affirm the panel's decision. Mack appealed to the Chancery Court of Madison County. After a hearing, the chancellor reversed the Board of Nursing's decision, finding it was not supported by substantial evidence and was arbitrary and capricious. We agree and affirm the chancery court's decision.

## STATEMENT OF FACTS

¶2. In 2003, Mack started working at the VA as a nurse practitioner. As a new employee, Mack was oriented on the VA's Computerized Patient Record System (CPRS). The VA had recruited Mack to operate a "stand alone" primary care clinic, the Pain Evaluation Triage and Treatment Clinic. At this clinic, Mack made and cancelled her own appointments. She was given additional responsibilities, such as developing a pain tele-medicine (CVT) clinic, working with the regional VA office, and serving on the National Pain Management Board. By this time, Mack had years of nursing experience.

¶3. In October 2012, after a change in the VA's administration, Mack and many other colleagues were moved to different areas of the VA. Mack was moved to Physical Medicine and Rehabilitation Services (PMRS), while continuing her other extra responsibilities. Nancy Bailey was the administrative coordinator of the PMRS clinic. Mack claims she was

---

license issued by the board, or to revoke or suspend any privilege to practice, or to deny an application for a license, or to fine, place on probation and/or discipline a licensee, in any manner specified in this article . . . ."

never instructed on how to schedule patients at the PMRS clinic; so she continued her practice of scheduling and cancelling her patients herself. Mack testified she was unaware that Bailey was actually responsible for handling the daily management of the clinic, creating scheduling grids, and scheduling appointments. Further, Mack claimed she was never told about the scheduling grid system, and she was unaware that the two clinics she covered—the CVT and PMRS clinics—operated under two different scheduling systems; therefore, double-booking was a recognized problem. Bailey, however, was aware of these issues.

¶4.    In May 2013, initial complaints about Mack's scheduling and documentation practices were reported to Bailey.[2] In August 2013, Bailey and Dr. Liep Tjeng, chief of the PMRS clinic and Mack's direct supervisor, met with Mack and discussed incomplete or no documentation in patient records, as well as copied-and-pasted documentation in patient records, which resulted in patient continuity-of-care concerns regarding inadequate documentation. Bailey and Dr. Tjeng also requested Mack to call patients personally to cancel appointments instead of having administration staff do it. In November 2013, Joe Battle, the VA Medical Center Director, sent a memo to Phyllis Johnson, a nurse practitioner working in the PMRS clinic, assigning her to perform a fact-finding investigation on Mack "surrounding concerns regarding the thoroughness, accuracy and timely completion of documentation of patient care as well as clinic utilization."

¶5.    Fellow PMRS clinicians Jeanna Cockrell-Brown and Lynn Jones, both registered

---

[2] Mack's annual employment evaluations for job performance were usually "highly satisfactory" or "outstanding" until 2013, when she received some "satisfactory" marks.

nurses and long-time VA employees, also initiated complaints against Mack and testified against her at the Board panel hearing. Cockrell-Brown testified to an incident that became central to Mack's prosecution and subsequent license probation. On November 15, 2013, Mack documented in the electronic record of "Patient J.L."[3] a face-to-face encounter and check-out time of 10:50 a.m., but Cockrell-Brown discovered that Mack had called the patient the day before to cancel the appointment. The Board of Nursing later used this incident as the basis for charges against Mack of intentionally falsifying patient records. Mack, however, explained that on that day she was double-booked to see patients in both the PMRS and CVT clinics. Therefore, to correct the problem, she called Patient J.L. to cancel his PMRS clinic appointment in order to cover the CVT clinic and noted the scheduling conflict in his electronic chart. Jones also testified that Mack's lack of documentation in patient records made it difficult to determine what the patients' plans of care were. She also stated Mack was difficult to reach at work, and Mack cancelled patients' appointments in the clinic without notifying them.

¶6.     On November 22, 2013, Johnson interviewed Mack, who admitted the following: she had been untimely in documentation of nursing notes in patient records; and that she did see Patient J.L. on November 15, because she had "switched him" to the CVT clinic from the PMRS clinic. On November 25, 2013, Johnson released her formal fact-finding report on Mack. For her investigation, Johnson interviewed ten VA employees, including Mack, Jones, Cockrell-Brown, and Bailey, and analyzed numerous patient medical charts. In

---

[3] Initials are used to protect the patient's privacy.

4

December 2013, the VA suspended Mack's clinical privileges, and she was removed from patient care because "aspects of [her] clinical practice [did] not meet the accepted standards of practice and potentially constitute an imminent threat to patient welfare"; specifically, there were allegations "that on many occasions documentation [of] patient care [was] below accepted standards."

¶7. In March 2014, the VA chief-of-staff, Dr. David Walker, wrote to Mack proposing her discharge based upon the fact-finding investigation by Johnson. He enumerated four charges: failing to complete clinical notes in a timely manner, misrepresenting clinical records, providing false information to a patient, and misusing "clinic time management." In response to Dr. Walker's charges, Mack wrote a detailed letter to Battle, explaining her perspective on incidents and correcting misstatements and also contending Bailey was the cause of these proceedings because Bailey viewed Mack as a threat once she was moved to the PMRS clinic. Also, in April and May 2014, sixteen letters and notes from co-workers (both nurses and physicians), patients, and friends in support of Mack were sent to Director Battle and entered into evidence at the administrative panel hearing. Ultimately, the VA changed its position and decided Mack's discharge was not warranted.

¶8. On July 23, 2015, Mack signed a Settlement Agreement with the VA. Mack agreed to a seven-day suspension and reassignment of duty in response to the four charges that were the grounds for her prior proposed discharge. Mack's union representative told her that signing the agreement would allow her to move forward at the VA. The agreement stated it "[did] not constitute an admission of guilt or liability on the part of either party" and

5

was "entered into solely for the purpose of resolving the stated matters in a manner mutually satisfactory to both parties." In return, the VA asked Mack to release any claims against it that were connected to the investigation. After Mack's seven-day suspension, she was transferred to the Neurology Department where its chief, Dr. Eric Undesser, became her supervisor. He testified Mack was good at her job as a nurse practitioner. Mack continued her employment in Neurology without further complaints.

¶9.　　However, in May 2016, the Board of Nursing filed a formal complaint against Mack, which is the issue in this appeal, based on Johnson's fact-finding investigation. The complaint only cited two charges related to two specific incidents.[4] The first charge (Charge I) was for negligently or willfully practicing nursing below the accepted standard. The complaint cited an incident on April 16, 2013, where Mack documented progress notes on "Patient D.W." before his check-in time at the VA.[5] The complaint also cited the Settlement Agreement and Mack's suspension for seven days for failing to complete clinical notes in a timely manner, misrepresenting clinical records, providing false information to patients, and misusing clinic time management. The second charge (Charge II) was for falsifying, or in a repeatedly negligent manner making incorrect entries, or failing to make essential entries on records. The complaint cited the incident on November 15, 2013, where Mack documented providing face-to-face care for Patient J.L., when actually she had called and

---

[4] In February 2016, Jones, Cockrell-Brown, and Bailey all filed signed statements with the Board of Nursing related to past complaints about Mack.

[5] This factual allegation for Charge I was ultimately refuted, and counsel for the Board of Nursing struck it before the administrative panel hearing. However, the Board proceeded with the allegations found in the Settlement Agreement.

6

left the patient a voice-message telling him not to come for his appointment.

¶10.    On December 7, 2016, the Board of Nursing three-member panel held a lengthy hearing where Bailey, Cockrell-Brown, Jones, Patient D.W., Mack, and Dr. Undesser testified.  The panel ruled that Mack was guilty of the two charges alleged in the complaint, and "the evidence clearly and convincingly establishes a basis for disciplinary action pursuant to Section 73-15-29. . . ."  In its June 2017 amended order, the Board of Nursing panel put Mack's advance practice privilege and nursing license on probation for twelve months.[6]  Mack was further fined $1,000 and instructed to attend four educational workshops related to the charges.

¶11.    Mack appealed to the full membership of the Board of Nursing.  In July 2018, the Board of Nursing heard arguments and voted to affirm the panel's decision.  Mack then appealed to the Madison County Chancery Court.  At a hearing in September 2019, the chancellor voiced concern about the lack of evidence supporting statutory violations of the pertinent standard of care.  Accordingly, the chancery court reversed the Board of Nursing's decision, finding it was unsupported by substantial evidence and "the pure definition of arbitrary and capricious."  The Board of Nursing now appeals from this judgment.

**STANDARD OF REVIEW**

¶12.    Upon judicial review, this Court must determine "whether or not the Board's decision (1) was supported by substantial evidence; (2) was arbitrary or capricious; (3) was beyond the power of the agency to make; or (4) violated some statutory or constitutional right of the

---

[6] The amended order corrected the initial order, which incorrectly stated Mack's license had been restricted, not placed on probation.

Appellant." *State Bd. of Nursing v. Hobson*, 283 So. 3d 290, 294 (¶9) (Miss. Ct. App. 2019) (quoting *Miss. Bd. of Nursing v. Hanson*, 703 So. 2d 239, 242 (¶8) (Miss. 1997)). Substantial evidence is "something more than a 'mere scintilla' or suspicion." *Pub. Emp. Ret. Sys. v. Walker*, 126 So. 3d 892, 895 (¶7) (Miss. 2013) (quoting *Pub. Emp. Ret. Sys. v. Marquez*, 774 So. 2d 421, 425 (¶13) (Miss. 2000)). Substantial evidence has been defined as "such relevant evidence as reasonable minds might accept as adequate to support a conclusion." *Id.* (quoting *Delta CMI v. Speck*, 586 So. 2d 768 (Miss. 1991)). Further, "[a]n act is arbitrary when it is done without adequately determining principle; not done according to reason or judgment" or is "non-rational." *Hobson*, 283 So. 3d at 296 (¶22) (quoting *Miss. State Dep't of Health v. Sw. Miss. Reg'l Med. Ctr.*, 580 So. 2d 1238, 1240 (Miss. 1991)). "An action is capricious if done without reason, in a whimsical manner, implying either a lack of understanding of or disregard for the surrounding facts and settled controlling principles." *Id.* (citing *Miss. State Dep't of Health v. Natchez Cmty. Hosp.*, 743 So. 2d 973, 977 (¶13) (Miss. 1999)).

¶13.    Additionally, "in administrative proceedings against professionals licensed by the state,"

> the disciplinary board or agency is charged to demand clear and convincing evidence of the offense. On judicial review, the Chancery Court does not proceed de novo, nor does [the appellate court]. Rather, the disciplinary agency's decision is insulated from judicial disturbance where it is supported by substantial evidence and is neither arbitrary nor capricious. *The judicial eye looks to see whether a fair-minded fact finder might have found the evidence clear and convincing that the offense had occurred, and, where that may be said, we will not disturb the Board's judgment.*

*Riddle v. Miss. State Bd. of Pharmacy*, 592 So. 2d 37, 41 (Miss. 1991) (citations omitted)

(emphasis added).

## ANALYSIS

¶14.    After the Board of Nursing's panel hearing, the panel found by clear and convincing evidence that Mack was guilty of both charges in the complaint.  The full Board voted to affirm the decision, but the chancery court reversed the decision.  On appeal, the Board of Nursing claims the chancery court disregarded its authority, misinterpreted law, and mistakenly considered the two charges as mere "employment issues."  The Board of Nursing now raises two issues: (1) the chancery court erred when it found the Board's findings and decision were not supported by substantial evidence, were arbitrary and capricious, and thus violated Mack's due process rights, and (2) the chancery court abused its discretion by reweighing the evidence previously considered by the Board, thereby substituting its judgment for that of the Board.  We shall discuss each issue in turn.

### I.    Substantial Evidence

¶15.    The Board of Nursing argues that substantial evidence was presented at the administrative panel hearing of Mack's substandard nursing documentation practice under Charges I and II.  However, in the chancery court's order reversing the Board of Nursing's decision, the court found "a complete lack of substantial evidence" to support the Board's decision that Mack was guilty of these two charges.  The court also found the Board's decision was "the pure definition of arbitrary and capricious."  We agree.

¶16.    "The only grounds for overturning administrative agency action by the appellate process is that the state agency has acted capriciously, unreasonably, arbitrarily; has abused

9

its discretion or has violated a vested constitutional right of a party." *Miss. State Bd. of Nursing v. Wilson*, 624 So. 2d 485, 489 (Miss. 1993) (quoting *Melody Manor Convalescent Ctr. v. Miss. State Dep't of Health*, 546 So. 2d 972, 974 (Miss. 1989)). If an agency's decision is not based on substantial evidence, it follows that the decision is also arbitrary and capricious. *Miss. Transp. Comm'n v. Anson*, 879 So. 2d 958, 963 (¶12) (Miss. 2004) (citing *Marquez*, 774 So. 2d at 425 (¶11)). However, in proceedings of a quasi-criminal nature, as here, the accuser has a higher standard of proof. The accusing party must prove its case by clear and convincing evidence before the disciplinary board. *Hanson*, 703 So. 2d at 242 (¶9) (citing *Riddle*, 592 So. 2d at 41). Then the reviewing court will examine "whether a fair-minded fact finder might have found the evidence clear and convincing that the offense had occurred . . . ." *Id.*

### A.    Charge I

¶17.    Charge I of the complaint stated Mack "negligently or willfully practiced nursing in a manner that failed to meet generally accepted standards of nursing practice" under section 73-15-29(1)(e). As support, the complaint cites the Settlement Agreement with the VA Mack signed on July 23, 2015, which suspended her employment for seven days due to "failure to complete clinical notes in a timely manner, misrepresentation of clinical records, providing false information to patients, and misuse of clinic time management."[7]

¶18.    Generally, settlement agreements are not admissible to prove liability or guilt under Mississippi Rule of Evidence 408. However, "formal rules of practice, procedure, and

_____

[7] These are the four charges initially cited by Walker in his notice of discharge.

evidence are more relaxed in proceedings before administrative agencies than in courts of law . . . ." *Alston v. Miss. Dep't of Emp. Sec.*, 247 So. 3d 303, 311 (¶29) (Miss. Ct. App. 2017) (quoting *McGowan v. Miss. State Oil & Gas Bd.*, 604 So. 2d 312, 318 (Miss. 1992)). Even though the rules are "relaxed," we have found no cases where an agency's decision has been upheld when based upon a settlement agreement, as here.

¶19.  As the chancery court acknowledged, the Board of Nursing improperly used the Settlement Agreement as proof of guilt for Charge I.  The court stated that "[i]t is absolutely clear that [the Board's finding] was founded upon a certain settlement agreement" that impacted Mack's "due process rights to defend herself as to that agreement."  On its face, the agreement states it cannot be used as an admission of any wrongdoing by Mack:

> *This settlement agreement does not constitute an admission of guilt or liability on the part of either party* and is entered into solely for the purpose of resolving the stated matters in a manner mutually satisfactory to both parties. This Agreement shall not serve as precedent for resolving any other complaints, grievances, appeals or actions, which have been or may be filed.

(Emphasis added).  Further, Mack did not consider the Settlement Agreement an admission of guilt.  The contract was a protective measure for Mack; her union representative advised her to sign it in order to move forward at the VA.  Mack states on appeal she would not have signed the agreement if she had known it would be "bootstrapped" to Charge I and used as evidence that she had violated generally accepted standards of nursing.  Such a usage undermines the purpose and policy behind settlement agreements.  Once the Settlement Agreement and Mack's alleged admissions within it are excluded from consideration, there is not substantial evidence to support a violation of section 73-15-29.

¶20.    In its initial brief, the Board of Nursing does not mention the Settlement Agreement's usage or impact.  In response to Mack's argument on its improper usage, the Board argues that Mack never objected to its being admitted into evidence before the administrative hearing, therefore claiming the issue is waived.  *See Latham v. Latham*, 261 So. 3d 1110, 1113 (¶14) (Miss. 2019) (An appellate court "will not review matters on appeal that were not raised at the trial court level.").  Yet the error was not the admission of the agreement into evidence, but the Board's using it to prove Mack's guilt.

¶21.    On appeal, the Board of Nursing points to the testimony of Cockrell-Brown and Jones, who worked with Mack in the PRMS clinic, as support for the charge.  Both nurses reported to Bailey that Mack had copied and pasted their nursing notes.  Further, the nurses reported that Mack took weeks or months before documenting her nursing practice.  The Board claims these deficiencies caused "concern and confusion" with the patients' care plans.  The Board also claims Mack admitted to some of these documentation deficiencies in her response to the VA's proposed notice of discharge dated March 7, 2014, proving her guilt.

¶22.    The evidence presented by the Board for Charge I is insufficient.  Bailey admitted that while she was in charge of scheduling Mack and her patients, she did not offer further evidence of Mack's misconduct, and she never made Mack's scheduling grid or helped her schedule patients.  Further, there was no evidence to support Johnson's fact-finding investigation.  Additionally, we do not consider Mack's seven-page response letter to the VA's March 2014 proposed discharge as an admission of guilt by Mack, as the Board

proposes. In the letter, Mack methodically addresses each charge, explaining her perspective, acknowledging shortcomings, and detailing her resolution through further training or other efforts. Mack admitted some nursing documentation errors, acknowledged the need for accurate documentation to deliver quality care, and explained that any errors in documentation from cutting and pasting "were a function of haste and will never be repeated." Further, she noted "the consult/clinic appointment tracking system in CPRS is cumbersome," "the chance of error in attaching an encounter to a consult/note is not uncommon," and if it occurred, was accidental.[8] Regarding misuse of clinic time, Mack expressed that she was "set up for failure" regarding scheduling and the balance of her duties in the CVT clinic and the PMRS clinic (which did not support her expanding the CVT clinic). Ultimately, the VA retracted its proposed discharge based on any documentation deficiencies, and Mack was reassigned to the Neurology Department after a seven-day suspension.

¶23. We agree with the chancery court that the Board improperly used the Settlement Agreement as the basis for Charge I and evidence against Mack. Additionally, the above allegedly improper documentation incidents are not substantial evidence of a violation of statutory nursing standards of care. We also cannot say that a fair-minded fact finder might have found by clear and convincing evidence that these documentation errors were intentionally falsified.

### B. Charge II

---

[8] Regarding her use of CPRS, Mack states her "attempts to promote the use of this mandated technology were defeated and sabotaged by the PMRS leadership."

¶24. Charge II of the complaint stated Mack "falsified or in a repeatedly negligent manner made incorrect entries or failed to make essential entries on record" in violation of section 73-15-29(1)(g). Charge II only related to one incident on November 15, 2013, regarding Mack's computer documentation of Patient J.L.[9]

¶25. The Board of Nursing cites statements by Mack allegedly showing she intentionally falsified Patient J.L.'s record to indicate a face-to-face encounter on November 15 when in fact she had called him and cancelled his appointment the prior day. During Mack's interview with Bailey on November 22, 2013, seven days after the incident, Mack stated she thought she saw Patient J.L. but then read the record notes and said the patient was scheduled for the PMRS clinic, thinking she must have switched him to the CVT clinic. At the administrative hearing in December 2016, Mack testified that CPRS generated the patient face-to-face encounter with J.L. The Board claimed Mack attempted to justify her record fabrication by citing scheduling conflicts between the PMRS and CVT clinics.

¶26. While the Board of Nursing claims Mack's inconsistent explanations about the J.L. patient encounter proves she intentionally falsified his visit, we are not convinced. The evidence indicated Mack could not consistently explain what happened with J.L.'s electronic record because the computer system and records were so confusing. It is undisputed that Mack was double-booked in the PMRS and CVT clinic on November 15. Mack further testified that she was frequently double-booked because of Bailey, who was in charge of

---

[9] At the end of the administrative hearing, counsel for the Board of Nursing reminded the panel that the documentation charges were not based on a pattern of problems, but only the November 15, 2013 Patient J.L. incident: "We didn't charge Ms. Mack with a whole bunch of issues regarding patient records. We charged her with one."

14

scheduling.[10] Mack testified that she attempted to rectify the scheduling issue by calling J.L. the day before his appointment at the PMRS clinic and asking him not to come in. Mack accessed his electronic chart to document the double-booking and cancellation, as the VA had requested her to do, writing: "scheduled into PMRS-Mack Clinic on Friday 11/15/13 during CVT Clinic." She claimed that adding this notation caused CPRS to convert the entry into a face-to-face encounter, which was unknown to her until later. Mack stated she did not know why CPRS generated an encounter to accompany the notation. Cockrell-Brown testified she was unsure what Mack's one-line note meant, but rather than ask Mack directly, Cockrell-Brown instead reported it to Bailey.

¶27. In addition, Jones testified about erroneous, auto-generated reports created by CPRS that were similar to what occurred with Mack's J.L. entry. At the administrative panel hearing on cross-examination, Jones testified that Cockrell-Brown's name appeared in one of Mack's patient records in February 2016 as having checked the patient out of the PMRS clinic at a time the patient was not at the clinic. Jones was surprised by the entry and, like Mack, could not fully explain it. She did testify that Cockrell-Brown must have been looking at the note, and "somehow [CPRS] puts your name on the encounter."

¶28. Moreover, the Board of Nursing disregarded the evidence showing problems with the VA's CPRS system. Dr. Undesser, Mack's current supervisor and the Chief of Neurology, testified at length during the administrative panel meeting via telephone. He was the former

---

[10] At the administrative hearing, the Board called Bailey, who admitted that even though her job was to put Mack on the scheduling grid and help schedule Mack's patients, she never did. Mack claimed this caused her to be double-booked on numerous occasions.

clinical information officer at the VA and had "been working with [the CPRS] system since its inception." He described the system as "pretty complicated" and "idiosyncra[tic]." He explained that the CPRS had malfunctions that would create the issue Mack experienced with the J.L. notation because of the way the system "attaches" encounter forms to appointments. Dr. Undesser testified that the system could not note a telephone call without attaching it to an appointment, thereby giving the impression the patient was actually seen face-to-face. Dr. Undesser did not hear Mack's testimony about Patient J.L.'s electronic chart, but his explanation of this "glitch" is entirely consistent with Mack's explanation of Patient J.L.'s inaccurate note. The Board offered no evidence to rebut Dr. Undesser's testimony.

¶29. The one-line note Mack made regarding J.L. is not substantial evidence to show she intentionally falsified patient records. Instead, the evidence shows it could be an error caused by the VA's own computer system. The VA, which was much more familiar with CPRS than the Board of Nursing, formerly had determined the error was not a terminable offense. The chancery court properly held that the Board of Nursing's decision finding Mack guilty of Charge II was not supported by substantial evidence and was arbitrary and capricious.

## II.    Reweighing the Evidence

¶30. The Board of Nursing argues that the chancery court abused its discretion by substituting its own judgment for that of the Board. It is well-established that there is a presumption of validity regarding an administrative agency's decision, but that presumption

is rebuttable; the challenging party has the burden of proving otherwise. *Earthgrains Bakery Grp. Inc. v. Miss. Dep't of Emp. Sec.*, 131 So. 3d 1163, 1168 (¶16) (Miss. 2014). It is also well-established that the reviewing court may not reweigh the facts or substitute its judgment for that of the agency. *Alston*, 247 So. 3d at 308 (¶18). If the reviewing court finds that the lower court has exceeded its authority in overturning an agency decision, it will reverse and reinstate the agency's decision. *Bd. of Law Enf't Officers Standards & Training v. Butler*, 672 So. 2d 1196, 1199 (Miss. 1996) (citing *Miss. Comm'n on Env't Quality v. Chickasaw Cnty. Bd. of Supervisors*, 621 So. 2d 1211, 1215 (Miss. 1993)).

¶31. The Board of Nursing supports its contention by pointing to a discussion at the chancery court hearing where the chancellor questioned the Board's counsel as to why an internal employment dispute escalated into a licensing review. Further, the chancellor asked how violating internal employer policies such as patient scheduling, making incorrect electronic entries, or copying and pasting patient notes, was indicative of willful or negligent nursing practices that would impact the health and safety of Mississippi citizens. The chancellor's comments, however, did not constitute a reweighing of the evidence but an attempt to ascertain if there was substantial evidence to support the charges. Further, the chancellor cited the correct legal standard from the bench when making his ruling. The chancellor ultimately ruled that the Board's decision was not supported by substantial evidence and was arbitrary and capricious. We find no error in this regard. Just because the chancery court reversed the Board's decision does not mean that the court "reweighed" the evidence. *See Miss. State Bd. of Nursing v. Wilson*, 624 So. 2d 485, 491 (Miss. 1993) (The

17

chancery court reversed the Board of Nursing's finding that a nurse was addicted to habit-forming drugs.). This argument is without merit.

## CONCLUSION

¶32. For the foregoing reasons, we affirm the chancery court's reversal of the Board of Nursing's decision, finding it was not supported by substantial evidence, and was arbitrary and capricious. A fair-minded fact finder could not have found by clear and convincing evidence that the offenses Mack was charged with occurred.

¶33. **AFFIRMED.**

**WILSON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. CARLTON, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. EMFINGER, J., NOT PARTICIPATING.**