# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-SA-00938-COA

DARRYL SIMMONS                                                                    APPELLANT

v.

MISSISSIPPI DEPARTMENT OF PUBLIC                                    APPELLEE
SAFETY

DATE OF JUDGMENT:              07/23/2020
TRIAL JUDGE:                        HON. ROGER T. CLARK
COURT FROM WHICH APPEALED:  HARRISON COUNTY CIRCUIT COURT,
                                     FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:        FRANCIS STARR SPRINGER
ATTORNEY FOR APPELLEE:         MICHAEL ERIC BROWN
NATURE OF THE CASE:            CIVIL - STATE BOARDS AND AGENCIES
DISPOSITION:                     AFFIRMED - 11/16/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE BARNES, C.J., GREENLEE AND LAWRENCE, JJ.

### BARNES, C.J., FOR THE COURT:

¶1.     The Mississippi Department of Public Safety (MDPS) terminated Trooper Darryl

Simmons from employment with the Mississippi Highway Safety Patrol after he

unnecessarily drew his firearm at the scene of a traffic accident. Aggrieved, Simmons

appealed, and the Mississippi Employee Appeals Board (EAB) affirmed the termination.

Simmons then appealed to the Harrison County Circuit Court, which affirmed the EAB's

order. Simmons now appeals from the circuit court's judgment, arguing that the allegations

leading to his termination are not supported by substantial evidence but consist only of

uncorroborated hearsay. Therefore, Simmons argues that the circuit court's decision to

affirm the EAB order must be reversed and his employment reinstated. We disagree and affirm.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2. The MDPS had employed Simmons as a State Trooper since 2012 (after a brief stint in 1987). On November 2, 2018, a Mississippi Highway Safety Patrol (MHSP) dispatch operator received a call from a motorist complaining about a highway patrol vehicle that was being driven erratically and unsafely. The patrol vehicle was thought to belong to Simmons, who was at the beginning of his shift, which started at 3:00 p.m. The dispatch operator stated she would notify the master sergeant about the driving complaint.

¶3. At 3:44 p.m., the dispatch operator received notice of an accident on Interstate 10, and she called Simmons to respond. The recorded telephone conversation was entered into evidence. Simmons answered with slurred speech and profanity, and he seemed incoherent. Concerned, the operator called Simmons's direct supervisor, Master Sergeant Marty Davis, stating that she had sent him an email about the driving complaint at 4:20 p.m. and that Simmons sounded "a little bizarre."

¶4. At 4:40 p.m., Simmons reported to the accident scene where he later remembered seeing an 18-wheeler and a small pickup truck parked on the side of the interstate. Sergeant Alex Lizana, another trooper, called Simmons and asked if he needed assistance. Simmons responded that he was having computer issues; so Sergeant Lizana drove to the scene. Master Sergeant Davis testified that Sergeant Lizana called him from the scene and told him that Simmons did not appear "right," and he believed Simmons did not need to drive.

2

Captain Carl Green arrived at the scene shortly after Master Sergeant Davis to check on Simmons's condition. He observed that Simmons's behavior was not typical of him. Additionally, Captain Green testified that at the scene, Sergeant Lizana "reluctantly" told him that he had seen Simmons pull his gun out.[1]

¶5. Master Sergeant Davis testified that when he arrived on the scene, Simmons "did not look right"—his speech was slurred and his eyes were dilated, but he was not stumbling. Master Sergeant Davis relieved Simmons of his sidearm, backup, and taser weapons. Simmons was taken to the substation where a urine specimen was collected to see if he was under the influence of controlled substances. Also concerned that Simmons might be having a medical episode, Master Sergeant Davis and Captain Green transported Simmons to an emergency room. After numerous blood tests and scans, physicians could not determine why Simmons experienced the episode but recorded it as a "transient altered mental status" of unknown origin. Simmons followed up with a neurologist, whose tests revealed nothing abnormal. At the time of the hearing, Simmons had not had another episode.

¶6. Simmons testified numerous times that he did not remember pulling his service weapon out. He remembered little about the afternoon but did recall a few things: being dispatched and arriving at the accident scene, Master Sergeant Davis's calling him about a civilian complaint and showing concern, being given a horizontal gaze nystagmus test, and both Davis and Green's wanting to take him to the hospital.

---

[1] This statement is the uncorroborated-hearsay issue Simmons raises on appeal. While Sergeant Lizana apparently provided a statement to investigators, it is not a part of the record and was not presented to the EAB.

¶7. Later, when the urine test results were obtained, they showed numerous controlled substances in Simmons's urine, including several different types of tranquilizers. Simmons stated he had taken the tranquilizers for several years for restless leg syndrome and trouble sleeping, and he always took the medications eight to ten hours before his shift prior to sleeping. Further, he had never experienced an episode where the medications had impacted his job performance. He also stated his physician was aware of the drugs he took.

¶8. On March 7, 2019, after an internal affairs interview and disciplinary hearing, Simmons was terminated for committing several Group II and III offenses, which included being under the influence of unknown (at that time) substances while on duty and exhibiting his service weapon and pointing it while on the scene of an accident. A "Special Order" to Simmons from Colonel Chris Gillard of the MHSP detailed the nature and facts of the charges against Simmons that resulted in his termination. The order stated that "[t]he charges were based upon Captain Green's knowledge, information, and belief . . . ." The letter detailed the events leading up to Simmons's display of his service weapon at the accident scene, stating that Sergeant Lizana arrived at the scene to assist Simmons with computer issues. After the computer issues were resolved,

> [w]hile on the scene and standing next to Simmons, Alex Lizana stated Simmons drew his weapon and pointed it at the front tire and muttered something while the driver of the vehicle was seated in the cab of his truck and the wrecker driver was standing on the left of him.

The order also stated that during the internal affairs investigation, when asked about the weapon incident, Simmons stated that Master Sergeant Davis arrived on the scene and "relieved him of his sidearm, backup, and ta[s]er weapons while he was sitting inside his

4

unit." However, Simmons "did not remember pulling his weapon at the wreck and did not have knowledge of doing so until he was informed several days later by Sergeant Alex Lizana."

¶9. Simmons appealed his termination to the EAB, and a hearing was held in August 2019. Captain Green testified he had known Simmons since 1993, been his superior since 2013, and never questioned Simmons's judgment in the exercise of his duties until recently. The EAB issued an order affirming the termination in October 2019 but found substantial evidence to support only two of the Group III offenses—both related to the draw of the service weapon: causing a threat to life or human safety by violating safety rules, and engaging in conduct related to job performance that could constitute negligence. The EAB was "most disturbed by this incident" and stated that whether Simmons was "sober, intoxicated, or having a medical episode, this conduct [wa]s unacceptable." The EAB stated, "Simmons'[s] actions . . . put himself, the general public and his co-worker at risk."

¶10. Simmons appealed to the circuit court, and in July 2020 the court affirmed the EAB order, finding Simmons had the opportunity at the EAB hearing to rebut the evidence supporting his termination but "did not or could not."

## STANDARD OF REVIEW

¶11. The scope of judicial review for administrative agency decisions is well settled. The reviewing court must affirm the agency decision if "the decision was (1) supported by substantial evidence; (2) not arbitrary or capricious; (3) within the scope or power of the agency; and (4) not a violation of the aggrieved party's constitutional or statutory rights."

5

*Miss. Dep't of Pub. Safety v. Smith*, 243 So. 3d 172, 174 (¶9) (Miss. 2018) (quoting *Ray v. Miss. Dep't of Pub. Safety*, 172 So. 3d 182, 187 (¶15) (Miss. 2015)).  The reviewing court may not substitute its judgment for that of the agency or reweigh the facts of the case.  *Alston v. Miss. Dep't of Emp. Sec.*, 247 So. 3d 303, 308 (¶18) (Miss. Ct. App. 2017).  This Court applies the same standard of review as the circuit court.  *Pub. Emps.' Ret. Sys. v. Marquez*, 774 So. 2d 421, 429 (¶32) (Miss. 2000).

## ANALYSIS

¶12.    Simmons contends the only evidence before the EAB to support his termination was Captain Green's uncorroborated hearsay testimony that Sergeant Lizana stated Simmons pulled his weapon, which cannot be considered substantial evidence.[2]  Simmons also claims he met his burden of persuasion before the EAB.  Therefore, he argues that the circuit court's decision to affirm the EAB order must be reversed.

¶13.    "A state agency's personnel decisions are entitled to a 'presumption of correctness.'"  *Miss. Dep't of Wildlife, Fisheries & Parks v. Bradshaw*, 196 So. 3d 1075, 1082 (¶18) (Miss. Ct. App. 2016) (citing *Miss. Dep't of Corr. v. Smith*, 883 So. 2d 124, 126 (¶1) (Miss. Ct. App. 2004)).  Regarding the burden of proof in such cases, the Mississippi Supreme Court has stated:

---

[2] The hearsay statement at issue occurred during Captain Green's direct examination by MDPS counsel at the EAB hearing, when Captain Green stated:

> After Master Sergeant Davis departed the scene with Trooper Simmons, Sergeant Lizana and I were making arrangements for his patrol car, which was left on the scene.  While I was talking to him before we moved the patrol car, he reluctantly informed me that he had seen Trooper Simmons pull his gun out.

> The statute and administrative regulations clearly place the burden of persuasion on the aggrieved employee to demonstrate that the reasons given are not true. . . . This is not mere semantics. Under our scheme, in a nutshell, ties go to the appointing authority. That is, unless the employee carries the burden of persuasion that the alleged conduct did not occur, the employee has no right to have the employment decision overturned.

*Miss. Dep't of Corr. v. McClee*, 677 So. 2d 732, 735 (Miss. 1996) (citations omitted); (*accord Miss. Emp. Sec. Comm'n v. Collins*, 629 So. 2d 576, 580 (Miss. 1993)). "The EAB is not authorized to reinstate the employee unless the employee carries his burdens of proof and persuasion 'that the reasons stated in the notice of dismissal are not true or are not sufficient grounds for the action taken.'" *Bradshaw*, 196 So. 3d at 1082 (¶18) (quoting *Bynum v. Miss. Dep't of Educ.*, 906 So. 2d 81, 90 (¶14) (Miss. Ct. App. 2004)). If the employee appeals an adverse decision of the EAB, "[t]he reviewing court must affirm the agency decision if the decision was (1) supported by substantial evidence; (2) not arbitrary or capricious; (3) within the scope or power of the agency; and (4) not a violation of the aggrieved party's constitutional or statutory rights." *Ray*, 172 So. 3d at 187 (¶16). "If an administrative agency's decision is not based on substantial evidence, it necessarily follows that the decision is arbitrary and capricious." *Marquez*, 774 So. 2d at 430 (¶35). The reviewing court must bear in mind that "[t]he EAB 'is the trier of fact as well as the judge of the witnesses' credibility.'" *Bynum*, 906 So. 2d at 90 (¶14) (quoting *Miss. Bureau of Narcotics v. Stacy*, 817 So. 2d 523, 526 (¶9) (Miss. 2002)).

¶14. The circuit court's July 2020 judgment affirmed the EAB's conclusions, quoting the EAB's order:

> Having considered the Mississippi State Personnel Board Policy and

7

Procedures Manual, the testimony of the witnesses, their demeanor and credibility, and after having drawn certain inferences from the evidence, including all documents introduced into evidence, *this tribunal finds Simmons has failed to meet his burden to establish that the basis for his discipline by DPS was untrue with respect to the drawing of the service revolver.*

(Emphasis added). The circuit court noted that Sergeant Lizana was on the scene and told Captain Green what he observed, and "[n]othing was introduced to counter the MDPS testimony that Simmons pulled his weapon that evening." Further, Simmons's own memory of the evening was "sketchy." Therefore, the circuit court found "Simmons failed to overcome the presumption that the conduct did indeed occur."

¶15. Simmons first argues that he met his burden of persuading the EAB that the reasons given for his termination were insufficient because the EAB dismissed two of the three charges against him. Simmons also contends his numerous statements that he had no memory of pulling his firearm (while remembering other events at the scene) rebuts the EAB's presumption of correctness. Because all three charges were based on this testimony, Simmons argues the EAB should have dismissed the weapon charge as well. Thus, Simmons contends the only question for this Court to determine is whether the EAB's decision was supported by substantial evidence.

¶16. Additionally, Simmons argues that following his rebuttal, the MDPS provided no substantial evidence but only uncorroborated hearsay evidence to support the allegation that he pulled his sidearm or exhibited it in a dangerous manner, to which Simmons's counsel promptly objected. Simmons claims that because uncorroborated hearsay is not considered substantial evidence, the EAB's decision to terminate him was arbitrary and capricious.

8

¶17. First, Simmons misconstrues the burden of persuasion at the agency level. Simmons, not MDPS, had the burden to show the EAB that the reasons for his dismissal, as detailed in the Colonel Gillard's March 7, 2019 letter, were untrue or insufficient. To prove the allegations untrue, Simmons would have had to prove to the EAB that he did not pull his weapon at the accident scene. However, he did not offer any proof that his weapon was not pulled. Simmons's inability to recall the incident is not a denial of the incident. Further, Simmons could have called any of the witnesses at the scene to testify that Simmons did not pull his weapon or that they did not observe Simmons's pulling his weapon, but he did not. These witnesses would include Sergeant Lizana, the drivers of the vehicles involved in the accident named in the accident report, or the wrecker driver. At the EAB hearing, Captain Green mentioned a statement given by Sergeant Lizana about Simmons's pulling his weapon. Simmons did not rebut this statement. Finally, the dismissal of Simmons's other charges had no bearing on the weapon charge; they were not based upon the truthfulness of Officer Lizana's statement but the facts relating to Simmons's taking prescribed medications and having never had a similar medical episode. Simmons had to rebut the presumption of correctness regarding the weapon at the agency level, and he failed to do so.

¶18. Simmons's second argument is that the uncorroborated hearsay testimony of Captain Green is insufficient to support the EAB's decision. Simmons cites *Williams v. Mississippi Employment Security Commission*, 395 So. 2d 964, 966 (Miss. 1981), for the proposition that uncorroborated hearsay is insufficient to meet the substantial evidence standard. *Williams* held, "Application of the substantial evidence rule to the case on appeal would

9

require reversal because uncorroborated hearsay is not substantial evidence, even though hearsay is admissible in an administrative proceeding." *Id.*

¶19.    We find controlling *McClinton v. Mississippi Department of Employment Security*, 949 So. 2d 805, 811, 813 (¶¶15, 24) (Miss. Ct. App. 2006), wherein Judge Southwick, writing for the Court, discussed in depth the history and usage of the "'uncorroborated hearsay' limitation" in Mississippi, a "rarely invoked" and "even less often explained" rule. *McClinton* also discussed the "residuum rule," described as the "near-inconsistency . . . of allowing uncorroborated hearsay as evidence, then not letting it be sufficient by itself to support [an agency] decision."[3]  *Id.* at 812 (¶21).  Scholars have indicated that federal government and most states have abandoned the rule because its "defects . . . are overwhelming."[4] *Id.* (citing 2 Kenneth Culp Davis & Richard J. Pierce, *Administrative Law Treatise* § 10.4, at 129-134 (3d ed. 1994)).  *McClinton* interpreted the direction of administrative practice in Mississippi "to have traveled away from the 'residuum rule'" as well, but *McClinton* noted that the rule has not been abandoned by the Mississippi Supreme Court. *Id.* at 814 (¶29).  As an intermediate appellate court, we must apply the residuum rule until our supreme court abandons it.  *Id.*

¶20.    *McClinton* listed "the key components of an analysis of the present condition of the

---

[3] Administrative law scholars explain that under the residuum rule, although an agency could "accept any evidence that is offered, still in the end there must be a residuum of legal evidence to support the claim before an award can be made." *Id.* at 812 (¶21) (citing Davis & Pierce, *infra* ¶19, § 10.4, at 130).

[4] In *Richardson v. Perales*, 402 U.S. 389 (1971), the United States Supreme Court abandoned the rule it had adopted in 1938.  *McClinton*, 949 So. 2d at 811 (¶18) (citing *Consol. Edison v. Nat'l Labor Rel'ns Bd.*, 305 U.S. 197, 230 (1938)).

residuum rule in Mississippi administrative practice" as the following:

(1) The rule does not apply in Workers' Compensation cases at least to the extent that hearsay medical records, properly authenticated, can be the sole medical evidence;

(2) A 2005 Mississippi Supreme Court opinion stated that hearsay medical records could be substantial evidence in Public Employee Retirement System determinations, and in so holding applied the reasoning of *Perales* which largely rejected the residuum rule in federal courts;

(3) The residuum rule was not applied in a 1986 decision involving the Public Service Commission, when the contested evidentiary issue was relatively minor in the decision; and

(4) Uncorroborated hearsay is usable as evidence if it has "satisfactory indicia of reliability."[5]

(5) An initial decision on unemployment benefits is based almost entirely on hearsay.

*Id.* at 814 (¶27). *McClinton* then examined its evidence under the two different standards:

(1) "the traditional even if not oft-applied requirement that among the collection of evidence used to make findings by an administrative agency, there must be at least one item that is not uncorroborated hearsay," and (2) "the direction that we find to be marked by current caselaw"—"whether the totality of the evidence supporting the decision is probative, reliable, and persuasive." *Id.* at 815 (¶30). We do the same.

¶21.    In analyzing the evidence under the two different standards identified in *McClinton*, we come to two possible results. Under the traditional residuum rule, we would have to reverse Simmons's termination because there is no evidence presented concerning the

---

[5] We determined that "if hearsay, even if not corroborated in the traditional sense, is highly probative because it has [a] strong indicia of reliability, it can at least in many situations be substantial evidence" to support an administrative decision. *Id.* at 814 (¶29).

11

weapon-draw other than Captain Green's testimony about what Officer Lizana told him.[6] Under the traditional standard, this evidence is insufficient to support an agency decision.

¶22.    Under the second standard—"whether the totality of the evidence supporting the decision is probative, reliable, and persuasive"—there is substantial evidence to affirm Simmons's termination.  Simmons did not offer any reason why Officer Lizana's statements regarding the weapon-draw would be unreliable.  Officer Lizana's statements regarding the events have never been challenged.  Further, there is no evidence of ill will or enmity between Simmons and Officer Lizana that would provide a reason why Officer Lizana might fabricate the evidence.  Captain Green even testified that Sergeant Lizana was "reluctant" to tell him about Simmons drawing his weapon: "He didn't want to tell me, but he knew he was obligated to."

¶23.    Moreover, all the other matters related by Officer Lizana to Captain Green from the accident scene proved true.  Simmons asked Officer Lizana to come to the scene to help with computer issues because Simmons needed a mouse.  Upon Captain Green's arrival, Officer Lizana was in the car helping with Simmons's computer.  Captain Green, Master Sergeant Davis, and the dispatch operator all recalled witnessing Simmons's behavior and/or speech, which was similar to Officer Lizana's representations.

¶24.    Captain Green testified that the description of the weapon draw was in a statement by Officer Lizana, which was apparently the source of the detailed description in the March

---

[6] Aware that Simmons had the burden of proving the agency decision wrong but apparently unaware of the residuum rule, the MDPS did not call Officer Lizana to testify at the EAB hearing.

7, 2019 Special Order relating the charges against Simmons. The statement provided, "While on the scene and standing next to Simmons, Alex Lizana stated Simmons drew his weapon and pointed it at the front tire and muttered something while the driver of the vehicle was seated in the cab of his truck and the wrecker driver was standing on the left of him."

¶25. No one has claimed that Officer Lizana's version of the events has ever changed over time. Most noteworthy, at the EAB hearing, Simmons testified that he did not know all the details of the traffic accident and had to get some of the facts from Officer Lizana in order to fill out the accident report:

> A.    Somehow or another at this accident scene, I wrote enough notes down where I could finish some of this accident report.
>
> . . . .
>
> A.    . . . [T]he next day I had zero idea which lane each one of those vehicles were in and . . . had been struck at.
>
> . . . .
>
> Q.    Did you -- since you put it on -- you made some notes, were you able to use that to generate your report --
>
> A.    Not that part.
>
> . . . .
>
> Q.    Okay.  How did you find that out?
>
> A.    From Alex Lizana.
>
> Q.    Okay.  Did you ask Alex Lizana or did he just tell you or --
>
> A.    I asked him.

Q. All right. Did you explain why you were asking that question?

A. Sure. He knew why I was asking.

Q. All right. And how did that exchange go? What did you -- what did you say exactly to him?

A. Just basically how I was explaining it to you. I don't -- I don't recall any of this -- how the vehicle -- you know, which lane the vehicles were in, where they impacted each other, where they were sitting after the wreck. I couldn't remember any of that.

. . . .

Later in the hearing, the following exchange occurred during Simmons's examination by his own counsel:

Q. I think your testimony earlier was that you had to get with someone to get the -- a lot of the facts of this traffic accident that you wound up -- I think the testimony was earlier that you filed that report. Were you disciplined on that traffic accident in any way?

A. No sir. As a matter of fact, it went through without a hitch.

Simmons found Officer Lizana's recollection of the accident scene sufficiently reliable to include in Simmons's accident report, and we find no reason to question the reliability of his account of the weapon draw.

¶26. Following the current direction of the residuum rule identified in *McClinton*, we conclude that Officer Lizana's statements, while uncorroborated, have a "satisfactory indicia of reliability" to provide substantial evidence for the EAB's decision.

**Conclusion**

¶27. Simmons failed to prove events relied upon by the EAB were untrue or insufficient to support his termination. Therefore, we affirm the circuit court's judgment.

14

¶28.    **AFFIRMED.**

**CARLTON, P.J., GREENLEE, WESTBROOKS, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR.  WILSON, P.J., McDONALD AND McCARTY, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**